[No. 2259]

MARY WREN, ADMINISTRATRIX OF THE ESTATE OF
THOMAS WREN, DECEASED; MARY WREN, AND
THOMAS WREN, JR., AND MARIE WREN, MINORS,
BY THEIR GUARDIAN AD LITEM, L. F. THOMAS,
APPELLANTS, v. THOMAS DIXON, RESPONDENT.

[161 Pac. 722; 167 Pac. 324]

1. CONSTITUTIONAL LAW—CONSTRUCTION—SELF-EXECUTING PROVI-
SIONS.

Const. art. 10, sec. 1, as amended in November, 1902 (Stats.
1901, p. 136), declared that the legislature should provide a
uniform and equal rate of assessment and taxation to secure a
just valuation of real and personal property, mining claims, etc..
and that the acreage of patented claims should be assessed at
the valuation of $10 per acre. Stats. 1905, c. 58, provided for
the assessment of patented mines at such valuation. Article 10,
sec. 1, as amended in 1906 (Stats. 1907, p. 501), provided that
patented mining claims should be assessed at not less than $500.
except when $100 in labor has been actually performed on such
mine during the year, in addition to the tax on the net proceeds,
and no legislation was passed pursuant to such provision until
1913. *Held*, that the constitutional amendment of 1906 was self-
executing at least as to the provision for taxation of patented
mines, and absolutely nullified the statute of 1905, so that an
assessment thereunder in 1909 was invalid.

2. CONSTITUTIONAL LAW—CONSTRUCTION—REPEAL OF STATUTES.

Statutes may be nullified, in so far as future operation is
concerned, by a constitution as well as by statute, as the con-
stitution is the direct, positive, and limiting voice of the people.
and may establish a policy, fix a limit to legislation on a given
subject, or prohibit specified acts as being performed by public
servants.

3. CONSTITUTIONAL LAW—CONSTRUCTION.

The object of construction, as applied to a written constitu-
tion, is to give effect to the intent of the people in adopting it.
which intent is to be found in the instrument itself, as it is to
be presumed that language has been employed with sufficient
precision to convey it, and, unless it appears that the pre-
sumption does not hold in the particular case, nothing will
remain but to enforce it.

4. TAXATION—MINES AND MINERALS—CONSTITUTIONAL PROVISIONS.

Under Const. art. 10, sec. 1, as amended in 1906 (Stats. 1907.
p. 501), to provide that, as to unpatented mines and mining
claims, the proceeds alone should be assessed and taxed, and
that patented claims shall be assessed at not less than $500,
except when $100 in labor has been actually performed thereon
during the year, in addition to the tax upon the net proceeds, a
patented mine cannot be assessed at less than $500 if no labor

has been performed, and a patented mine on which labor has been performed is exempt from taxation except on the proceeds thereof, and, in the absence of any saving clause, an assessment at $10 per acre under Stats. 1905, c. 58, pursuant to article 10, section 1, prior to the amendment of 1906 was invalid.

5. CONSTITUTIONAL LAW—SELF-EXECUTING PROVISIONS.

Prohibitory provisions in a constitution are usually self-executing to the extent that anything done in violation of them is void, and no legislation is required to execute such provision; but they are not self-executing when they merely indicate principles without laying down rules by which they may be given the force of law.

6. CONSTITUTIONAL LAW—SELF-EXECUTING PROVISIONS—CONSTRUCTION.

In determining when a constitutional provision is self-executing, there is a distinction between a declarative limitation of legislative power on a given subject, within which legislation may or should be enacted, and positive constitutional inhibition which no legislative act can relieve or modify; the former might require future legislation; the latter must, from its nature, be self-executing.

7. TAXATION—ASSESSMENT—TAX SALE—VALIDITY.

Where an assessment on a patented mining claim at $10 per acre under Stats. 1905, c. 58, expressly following Const. art. 10, sec. 1, as amended in 1902 (Stats. 1901, p. 136), was void under the amendment of that section in 1906 (Stats. 1907, p. 501), providing for an assessment of such claims at $500, with certain exceptions as to labor performed, etc., the tax sale under the assessment was void.

8. LIMITATION OF ACTIONS—TAX TITLE—ACTION TO DETERMINE—STATUTES.

Rev. Laws, 4946, provides that civil actions can only be commenced within the periods prescribed in the act, after the cause of action has accrued, except where different limitation is prescribed by statute. Section 4951 provides that no action to recover a mining claim shall be maintained unless plaintiff was seized or possessed thereof within two years before the commencement of such action, defining occupation and adverse possession, and extending the provisions of the act applicable to other real estate to mining claims, provided that in such application "two years" shall be intended when "five years" is used, and section 4952 provides that no cause of action to recover real property shall be effectual, unless the person prosecuting the action was seized or possessed of the premises within "five years" before action was commenced, and section 4966 provides that, if one entitled to commence an action to recover real property shall be a minor, the time of disability is no part of the time limited for the commencement of such actions, which may be commenced within two years after the removal of disability. *Held* that, by interpolation, section 4951 was to be

read as if providing that, if a person to whom an action to recover a mining claim accrues is a minor, the period of disability shall not be part of the time limited for the commencement of such action, which may be commenced within two years after the disability ceases.

9. LIMITATION OF ACTIONS—STATUTES—CONSTRUCTION.

The statute of limitations, like any other statute, is to be construed according to the manifest intention of the legislature, and, in ascertaining such intention, the language used should be construed, if possible, according to the usual meaning of the words used.

10. DESCENT AND DISTRIBUTION—WILLS—TITLE—TIME OF VESTING.

Under the statutory provisions and procedure relative to the estates of decedents, the title to real estate vests in the heirs and devisees at the moment of the death of the testator or intestate, subject only to the right of possession of the executor or administrator under Rev. Laws, 5950, for the payment of the debts and expenses of administration, with the right in the administrator to possession until the estate is settled or delivered over to the parties entitled by the order of the probate court.

11. LIMITATION OF ACTIONS—BAR AGAINST TRUSTEE—RIGHT OF CESTUI QUE TRUST.

Whenever a right of action in a trustee with the legal title is barred by limitations, the right of the *cestui que* trust is also barred, but, if the legal title in the *cestui que* trust, the statute of limitations which might run against the trustee will not constitute a bar against the *cestui* if he be under disability.

12. DESCENT AND DISTRIBUTION—RIGHT OF HEIRS—ESTATE IN ADMINISTRATION.

Where an administrator or executor has been appointed, and the estate is in the course of probate, it is the right of the heirs to maintain an action as against third persons for the possession of the realty.

13. LIMITATION OF ACTIONS—PERSONAL REPRESENTATIVE—STATUTE.

Under Rev. Laws, 5911, providing that every person to whom letters testamentary or of administration shall have issued shall execute a bond with a penalty not less than the value of the personal property, including rents and profits, and may be required to give an additional bond whenever the sale of realty is ordered, the relationship of trustee and *cestui que* trust between the executor or administrators and the heirs is not created in so far as the same might apply to the realty of an estate, so that the rule that a statute of limitations running against a trustee holding the legal title to realty runs also against the *cestui* does not apply. ·

14. MINES AND MINERALS—RECOVERY OF MINING CLAIMS—STATUTES.

Under Act of Congress July 26, 1866, c. 262, 14 Stat. 252, providing for the patenting of mining claims, Rev. Laws, sec. 4951, providing that no action to recover mining claims shall be

maintained unless plaintiff or those under whom he claims was seized or possessed of such claim within two years before the commencement of such action, and section 4952, providing that no cause of action upon title to real property shall be effectual unless the person prosecuting the action was seized or possessed of the premises in question within five years before the commission of the act in respect to which the action is prosecuted, and section 4953, referring to mining claims as such, enacted subsequent to the federal statute, applied to patented as well as unpatented mining claims, and an action to recover a patented claim must be commenced within two years from the time when plaintiff was seized or possessed of such claim.

15. LIMITATION OF ACTIONS—MINING CLAIM—NOTICE—INFERENCE.

Minor heirs of one who had duly patented mining claim were entitled to notice of the hostile character of defendant's possession, which notice could not be given them until they were capable in law of receiving it; so that, under the statute (Rev. Laws, 4951, et seq.) they might commence an action to recover it within two years after majority, when they were chargeable with notice.

ON PETITION FOR WRIT OF ERROR TO UNITED STATES SUPREME COURT

1. COURTS—FEDERAL SUPREME COURT—REVIEW OF STATE COURT—FEDERAL QUESTION.

To suggest or set up a federal question for the first time in a petition for rehearing in the highest court of the state is not in time.

2. COURTS—REVIEW BY FEDERAL SUPREME COURT—FEDERAL QUESTION.

In an action to quiet title to a mining claim and mill site claimed under a United States patent duly recorded, where the agreed statement of facts asserted defendant's adverse possession under a certificate of tax sale, and precluded the idea of plaintiff's possession, the court's assertion that plaintiff had never taken possession was within the record, especially where the judgment for defendant did not turn upon such assertion, and a petition for a writ of error to the United States Supreme Court on the ground that the court's opinion raised a federal question would be denied.

APPEAL from Third Judicial District Court, Eureka County; *Peter Breen*, Judge.

Action to quiet title by Mary Wren, administratrix of the estate of Thomas Wren, deceased, and by Mary Wren, individually, and Thomas Wren, Jr., and Marie Wren, minors, by their guardian *ad litem*, L. F. Thomas, against Thomas Dixon. Judgment for defendant, and plaintiffs appeal. **Affirmed** as to appellant Mary Wren, and **reversed** as to appellants Thomas Wren, Jr., and

Marie Wren, and judgment ordered to be entered in accordance with the prayer of their complaint to the extent of their interest as heirs of Thomas Wren, deceased.

Petition for writ of error to the Supreme Court of the United States **denied.**

## STATEMENT OF FACTS

Thomas Wren died on the 8th day of February, 1904, leaving a widow and two minor children. At the time of his death he was the owner in fee simple of a mining claim and mill site situated in the Mount Hope mining district, Eureka County, Nevada, known as the Good Hope mining claim and mill site. Title to this property was in the said Thomas Wren, deceased, at the time of his death, by United States patent issued to him by the government and bearing date of February 16, 1886. This patent was duly recorded in the recorder's office in the county of Eureka on the 2d day of February, 1911.

Upon the death of the said Thomas Wren, his last will and testament was duly admitted to probate in the district court of the Second judicial district in and for Washoe County; and on the 18th day of March, 1904, Mary Wren, widow of the deceased, was duly appointed and qualified as administratrix of the said last will and testament, and ever since the last-named date she has been and is now the duly appointed, qualified, and acting administratrix of said estate, which said estate has never been closed, and the same is now pending in the district court.

In 1909 the assessor of Eureka County assessed the Good Hope mining claim and mill site to the estate of Thomas Wren, deceased, at the rate of $10 per acre, under the statutes of Nevada as enacted by the session of the legislature of 1905. The amount of taxes accruing thereon and payable to the county by reason of such assessment was $11.85. It is admitted that the administratrix of the estate of Thomas Wren, deceased, failed and neglected to pay the taxes levied under the assess-

ment, and thereupon the treasurer and ex officio tax receiver of the county of Eureka advertised the property as delinquent in the payment of taxes, and later sold the property to defendant here, Thomas Dixon, who paid the tax and costs and expenses thereof and received from the tax receiver a certificate of sale. It is admitted that during the period of redemption after the issuance of the certificates of sale neither the administratrix of the estate of Thomas Wren, deceased, nor any person acting for or in behalf of the minor heirs of said estate, redeemed the property.

On the 20th day of July, 1910, the county of Eureka made and executed and delivered to Thomas Dixon, the defendant here, its tax deed for the patented mine known as the Good Hope mining claim and mill site, property of Thomas Wren, deceased, and a part of his estate.

It is admitted that in so far as the tax sale and proceedings thereunder were concerned, such were regular except as they may have been affected by the constitutional amendment of 1906.

Immediately after the receipt by the said Thomas Dixon, defendant herein, of the certificate of sale of the Good Hope mining claim and mill site in the year 1909, he entered into possession of the patented mine and mill site; and it is admitted that he has remained in actual, continued, open, notorious, and exclusive possession thereof, claiming the same adverse to all persons, said entry and possession dating from the month of January, 1910.

It is admitted that during the years 1910, 1911, 1912, and 1914 the county assessor assessed this property, consisting of a patented mining claim and mill site to the defendant herein in the manner provided by law, and that the defendant paid all the taxes so levied and assessed against this property for the years 1910, 1911, 1912, and 1914, to the county treasurer of Eureka County.

It is admitted that Mary Wren, administratrix of the

estate of Thomas Wren, Thomas Wren, Jr., and Marie Wren are the heirs at law of the said Thomas Wren, deceased, and that the said Marie Wren and Thomas Wren, Jr., were at the time of the death of Thomas Wren, and were at the time of the commencement of this action, minors.

This action was commenced in the district court of the Third judicial district in and for the county of Eureka on July 3, 1914, by Mary Wren, as administratrix of the estate of Thomas Wren, deceased, and also by Mary Wren in her individual capacity, and by Thomas Wren, Jr., and Marie Wren, minors, by and through their guardian *ad litem,* L. F. Thomas. The action was one to quiet title in the plaintiffs. The case was submitted to the trial court on an agreed statement of facts. Judgment being rendered for the defendant quieting title to the property in him, appeal is taken to this court from that judgment.

Section 1 of article 10 of the constitution was originally, and prior to 1902, as follows:

"The legislature shall provide by law for a uniform and equal rate of assessment and taxation, and shall provide such regulations as shall secure a just valuation for taxation of all property, real, personal, and possessory, excepting mines and mining claims, the proceeds of which alone shall be taxed, and also excepting such property as may be exempted by law for municipal, educational, literary, scientific, religious, or charitable purposes."

At the legislative session of 1899, and on March 3 of that year, an amendment to this section of the constitution was proposed and passed (Stats. 1899, p. 139), and on March 6, 1901, the same was again passed by the legislature (Stats. 1901, p. 136) ; and at the general election in November, 1902, it was approved by the people. This amendment to section 1 of article 10 was as follows:

"But the acreage of patented mining claims shall also be assessed at a valuation of $10 per acre."

The legislature of 1905 passed an act, section 1 of which provides:

"It is hereby made the duty of the assessors in the various counties of the state to place upon the assessment rolls of their respective counties all patented mines situated within such counties, which mines shall be assessed for taxation at the valuation placed upon them by section 1 of article 10 of the constitution of the State of Nevada, as amended by resolution proposed and passed at the nineteenth session of the Nevada Legislature, March 3, 1899, agreed to and passed at the twentieth session, March 6, 1901, and approved by vote of the people at the general election in November, 1902." (Stats. 1905, p. 81.)

In the year 1903 (Stats. 1903, p. 289) the legislature of this state proposed and passed a constitutional amendment to section 1 of article 10, and in March, 1905 (Stats. 1905, p. 327), this amendment was again passed by the legislature, and at the general election of 1906 it was ratified by the vote of the people. Section 1 of article 10 of the constitution (Rev. Laws, 352), as thus amended by popular vote at the election of 1906, reads as follows:

"SECTION 1. The legislature shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal and possessory, except mines and mining claims, when not patented, the proceeds alone of which shall be assessed and taxed, and, when patented, each patented mine shall be assessed at not less than five hundred dollars ($500) except when one hundred dollars ($100) in labor has been actually performed on such patented mine during the year, in addition to the tax upon the net proceeds; and, also excepting such property as may be exempted by law for municipal, educational, literary, scientific, or other charitable purposes."

No legislation was passed pursuant to this new constitutional provision until 1913.

*Sweeney & Morehouse,* for Appellants:

All authorities are to the point that a void tax deed does not constitute an adverse possession when possession is taken under it, nor set the statute of limitations in motion. This court cannot, therefore, do otherwise than reverse the judgment; and, as the case is submitted on an agreed statement of facts, there is no cause to be tried in the lower court, and there should be an order and decree for the plaintiffs.

The certificate of sale and deed made to the defendant were and are absolutely void, for the reason that the constitutional amendment authorizing the assessment of patented mines at the rate of $10 per acre was repealed by the amendment adopted by the legislature and ratified by the people in 1906, now known as article 10 of the constitution of the State of Nevada, fixing the assessment of patented mines at not less than $500, except when $100 worth of labor has been performed during the assessment year upon such mine, and as this assessment was made by the assessor of Eureka County in 1909 at the rate of $10 per acre, it was an absolutely void assessment. The present constitutional amendment repealed absolutely the old constitutional amendment and all laws thereunder, and therefore there were no taxes levied or assessed against the property in controversy in 1909; and all subsequent assessments not being made against the estate of Thomas Wren, or the heirs of Thomas Wren, they are likewise void, and therefore the defendant acquired no right or title to the property in dispute by reason of the assessment made by the assessor of Eureka County.

Under the provisions of section 3667, Revised Laws, minors have a right of redemption any time within six months after their disability is removed, and therefore no statute of limitations can run against them by reason of a sale until six months after they become of age. In this case, no suit was brought for the recovery of the taxes, and no process served upon the executrix, mother, father, or guardian of the minors.

Where the legal title vests in persons who are under disability, or who cannot enter into the possession of the property, the statute of limitations cannot run or commence to run until the disability is removed or the right of entry given. (*Collins* v. *McCarthy,* 68 Tex. 150; *Grimsby* v. *Hudness,* 76 Ga. 378; *McQuitty* v. *Wilheit,* 117 S. W. 730.) If the title is in the heirs and not in the administrators, the minors would have two years after they became of age in which to bring an action for the recovery of the property, and no statute of limitations would run against them in the meantime. (*Learned* v. *Ogden,* 32 S. W. 278; *Frost* v. *Eastern Railroad,* 64 N. H. 220; *Mayer* v. *Kornejey,* 50 South. 880; *Colton* v. *Onderdonk,* 69 Cal. 159; *Crosby* v. *Dowd,* 61 Cal. 557.)

Under our law, while an estate of real property is in probate, there is no right of entry in the heirs until distribution; and they being minors or even adults, and as they do, under our law, own the legal title, they have no right of entry until distribution, and the minors have no right of action until they are of age. Therefore no statute could run against minors, during their disability, nor against the widow until she has a right of entry, the rule being that the statute of limitations does not commence to run until there is a right of entry. (*Jackson* v. *Johnson,* 15 Am. Dec. 433; *McCarthy* v. *King's Heirs,* 39 Am. Dec. 165; *Osborn* v. *Hopkins,* 117 Pac. 519; *Stephenson* v. *Van Balken,* 118 Pac. 1027.)

For the purpose of taxation, a "mining claim" does not include a patented mine. (*Salisbury* v. *Land,* 63 Pac. 383; *Walter* v. *Hughes,* 11 Pac. 122.) In the interpretation of statutes, words in common use are to be construed in their natural, plain, and ordinary signification." (36 Cyc. 1114.) "The rule is cardinal and universal that if a law is plain and unambiguous there is no room for construction or interpretation." (*Brown* v. *Davis,* 1 Nev. 409; *State* v. *Washoe County,* 6 Nev. 104; *Ex Parte Rickey,* 100 Pac. 134; *Ex Parte McCoy,* 101 Pac. 419.) The words "mining claims" refer only

to locations and possessory rights, the reason being that the "mining claim" precedes the issuance of the patent. The patent is based upon the mining claim, and not the mining claim upon the patent. (*Round Mountain* v. *Round Mountain Sphinx,* 36 Nev. 543.)

"Where two legislative acts are repugnant to or in conflict with each other, the one last passed must govern, although it contains no repealing clause." (36 Cyc. 1073.) Such being the rule as to statutes, it certainly applies, and with greater force, to an organic act of the people at an election. "When an act is repugnant to a prior act, it repeals the prior act, without any repealing clause." (*State* v. *Burt,* 43 Cal. 560; *Pierpont* v. *Crouch,* 10 Cal. 315; *People* v. *Sargent,* 44 Cal. 430; *Baca* v. *Board,* 62 Pac. 979; *Baum* v. *Sweeney,* 32 Pac. 778.) "In interpreting the meaning of the language of a constitution we adopt the same rule which obtains in interpreting statutes." (*Oakland v. Hilton,* 69 Cal. 491.) Such being the case, it must be apparent that when the people adopted the amendment of 1906 they intended that patented mines should be assessed in no other way than at not less than $500, and purposely repealed previous provisions giving the power to assess at $10 per acre.

"In the absence of a saving clause, the adoption of a new constitution or the amendment of an old operates to supersede and revoke all previous inconsistent and irreconcilable constitutional or statutory provisions and rights exercisable thereunder, at least so far as their future operation is concerned." (Ency. U. S. Sup. Ct., vol. 4, p. 71.) "If a statute is repealed without a saving clause, the effect is to obliterate it as completely as though it had never been enacted." (*Bell* v. *Talman,* 67 Pac. 339; *Anderson* v. *Byrnes,* 54 Pac. 821; *Mahony* v. *State,* 12 Md. 322; *Wall* v. *State,* 18 Tex. 882; *Sinking Fund Com.* v. *George,* 47 S. W. 779; *Thorne* v. *San Francisco,* 4 Cal. 165; *Gilleland* v. *Schnyder,* 9 Kan. 569; *McMain* v. *Bliss,* 31 Cal. 122.)

If an assessment is made without any law authoriz-

ing it, is such an assessment any assessment at all, and
is a.case under it any sale? Tax proceedings are *in
invitum,* and to be valid must be *stricti juris.* (Cooley,
Taxation, 259; *Moss* v. *Sheave,* 23 Cal. 46; *People* v.
*Mahoney,* 55 Cal. 288; *Lake Co.* v. *M. Co.,* 66 Cal. 20;
*Knowlton* v. *Moore,* 85 N. E. 160.) Failure to comply
with the statutory requirements, even in minute par-
ticulars, is fatal to the sale. (*Charland* v. *Home,* 134 Am.
St. Rep. 696.) If substantial requirements are not com-
plied with, the sale is void. (*Brown* v. *Wright,* 17 V. C.
97; *Scales* v. *Alirs,* 12 Ala. 617; *DeWitt* v. *Hays,* 2 Cal.
463.) One who claims title to land under a sale must
affirmatively show that the law was strictly complied
with. (*Blakemoire* v. *Cooper,* 125 Am. St. Rep. 574;
*Ayers* v. *Lunol,* 124 Am. St. Rep. 1046.) The assess-
ment being void, all subsequent proceedings· and the
deed thereunder are likewise void. (*Wright* v. *Fox,* 89
Pac. 832; *Grotefend* v. *Ultz,* 53 Cal. 666; *Kelsey* v.
*Abbott,* 13 Cal. 609; *Smith* v. *Davis,* 30 Cal. 536; *Green-
wood* v. *Adams,* 21 Pac. 1134; *Dranga* v. *Rowe,* 59
Pac. 944.)

"Possession under a tax sale certificate is, during the
period of redemption, an admission that the possession
is subject to the owner's right of redemption that is not
adverse to the true owner." (*Pease* v. *Lawson,* 33 Mo.
35; *McKeighan* v. *Hopkins,* 15 N. W. 711; *Bowman* v.
*Wettig,* 39 Ind. 416; *Hulsman* v. *Deal,* 108 Pac. 849;
*Burdick* v. *Kimball,* 101 Pac. 845; *Kingston* v. *Ewart,*
116 Pac. 495.) "A purchaser at a tax sale has no title
until the time for redemption has expired." (*Harter* v.
*Com.,* 115 Pac. 1070.) No tender of the taxes or of the
money paid need be made. (Rev. Laws, 5514; *Dranga* v.
*Rowe,* 59 Pac. 944; *McLaughlin* v. *Bonynge,* 114 Pac.
798; *Cohen* v. *Anderson,* 135 Pac. 1096.)

*Chas. B. Henderson, Carey Van Fleet,* and *E. E. Caine,*
for Respondent: ᵒ

This action cannot be maintained, for the reason that
the assessment upon which defendant's deed passed was

a good assessment at the time it was made, our present section of the constitution not being self-executing, and there being no law to enforce it until 1913; and for the further reason that this action is barred by section 4951, Revised Laws, which has been the law during all of the period covered by the facts.

Section 1, article 10, of the constitution, as amended in 1906, is self-executing to the extent that the legislature cannot assess patented mines at less than $500, but it is not self-executing to the extent that the assessment of patented mines must be carried out by further legislation. (*Ewing* v. *Oroville Mining Co.*, 56 Cal. 655; *Griffin* v. *Rhoton,* 107 S. W. 381; *French* v. *Teschemaker,* 24 Cal. 539; *Southern Express Co.* v. *Patterson,* 123 S. W. 353; *Marshall* v. *Sherman,* 51 Am. St. Rep. 656; *Willis* v. *Mabon,* 31 Am. St. Rep. 629; *Model Heating Co.* v. *Magarity,* 81 Atl. 397.)

The section with which we are dealing intends only to lay down certain principles with regard to uniformity of taxation of all property, including patented mines, laying a limitation upon the power of the legislature with regard to patented mines, but this being in and of itself not a method of procedure for the assessment of patented mines. "Where a constitutional provision is complete in itself, it needs no further legislation to put it in force. When it lays down certain general principles as to the enactment of laws upon a certain subject, or for the incorporation of cities of certain populations, or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is self-executing only so far as it is susceptible of execution." (*Davis* v. *Burke,* 179 U. S. 399, 45 L. Ed. 251; *Stephens* v. *Benson,* 91 Pac. 577; *Acme Dairy Co.* v. *City of Astoria,* 90 Pac. 193; *State* v. *Jones,* 137 Pac. 554; *Kelsey* v. *District Court,* 139 Pac. 433; *Older* v. *Supreme Court,* 109 Pac. 478; *Town of Lyons* v. *City of Longmont,* 129 Pac. 198; *Lanigan* v. *Town of Gallup,* 131 Pac. 997; *St. Louis Ry. Co.* v. *Fire Association,* 28 L. R. A. 23.)

The statute of limitations, in cases like the present, runs during minority of the party affected. Whenever the right of action in the trustee is barred by the statute of limitations, the right of the *cestui que* trust is thus also barred. (*Meeks* v. *Olpherts,* 100 U. S. 564, 25 L. Ed. 735.) The administrator with regard to the heirs stands in the relation of trustee and *cestui que* trust. (*Harland* v. *Peck,* 33 Cal. 515.) Upon the death of a testator, a right of action vests in the executor, and if he is barred by the statute, so is the heir, although a minor when the cause of action accrued. (*Jenkins* v. *Jensen,* 66 Pac. 773; *McLeran* v. *Benton,* 73 Cal. 329; *Dennis* v. *Bint,* 122 Cal. 40, 54 Pac. 378; *Stapples* v. *Connor,* 79 Cal. 15, 21 Pac. 380; *Patchett* v. *Railway Co.,* 100 Cal. 505, 35 Pac. 73; *Lloyd* v. *Ball,* 77 Fed. 365; *Snyder* v. *Saober,* 56 N. J. L. 20, 27 Atl. 1013.) Where a trustee holds the legal title to real estate, which is barred by the statute of limitations, the equitable interests dependent upon it will also be defeated, notwithstanding that the *cestui que* trust is an infant. (*Wilson* v. *Louisville Trust Co.,* 44 S. W. 121.)

The real property follows the personal property in the hands of the executor or administrator, and he bears the same relationship to the real property as he does to the personal property. (*Griffith* v. *James,* 155 Pac. 251; *Bishop* v. *Locke,* 158 Pac. 997; *Robertson* v. *Burrell,* 110 Cal. 568, 42 Pac. 1086; *Gearfield* v. *Bridges,* 75 Fed. 47; *Webb* v. *Winter,* 67 Pac. 691; *Matthews* v. *Dunkee,* 16 South. 413; *Partee* v. *Thomas,* 11 Fed. 778; *Nash* v. *Simpson,* 78 Me. 153, 3 Atl. 58; *Taft* v. *Decker,* 182 Mass. 110, 65 N. E. 508.)

There is no claim that the tax deed herein is void upon its face. In fact, if it is invalid at all, it is voidable and not void; voidable by reason of the question of the constitutionality of the statute under which it was issued. A void deed on its face may give color of title as effectually as though the deed were regular on its face and void for reason *dehors* the instrument. This is especially true where the effects are such as only a person of legal

learning and experience could by critical examination discover. (2 C. J., secs. 336–338, 362–364.)

By the Court, McCARRAN, J. (after stating the facts) :

As we view the case at bar, it presents two questions of primary importance: First, in view of the provisions of section 1 of article 10 of the constitution of this state as amended in 1906 (Stats. 1907, p. 501), was the assessment made in 1909 by the assessor of Eureka County of $10 per acre on the patented mining claim of Thomas Wren, deceased, a valid assessment, and incidental to this, were the certificate of sale and deed made to the defendant Dixon valid instruments? Second, is the action barred by the statute of limitations? We shall approach these questions in the order stated.

1, 2. At the outset, let us bear in mind that it was not until after the constitutional amendment of 1902 that mining claims were at all assessable in this state. The amendment to the constitution adopted that year provided for the assessment of patented mining claims at a valuation of $10 per acre. Pursuant to that particular amendment, and only pursuant thereto, the legislature of 1905 (Stats. 1905, p. 81) passed the act authorizing assessors to assess patented mines; and the statute in that respect points for its authority directly and specifically to the constitutional amendment adopted at the general election held on November 4, 1902. This statute took its constitutional authority and its operative vitality, so to speak, directly from the constitutional amendment providing for the assessment of patented mines at a flat valuation of $10 per acre.

It will be unnecessary for us to comment on or even conjecture as to the reasons that impelled the legislature of 1903 to take the initial step in setting aside this particular amendment to section 1 of article 10 of the constitution; suffice it to say that it passed another amendment to that section and article of the constitution, which at its adoption at the general election of

1906 struck completely, nullified, and set aside this former provision.

Section 1 of article 10 of the constitution (Rev. Laws, 352) after its adoption in 1906 provided:

"The legislature shall provide by law for a uniform and equal rate of assessment and taxation, and shall prescribe such regulations as shall secure a just valuation for taxation of all property real, personal, and possessory, except mines and mining claims, *when not patented,* the proceeds alone of which shall be assessed and taxed, *and when patented, each patented* mine shall be assessed at not less *than five hundred dollars ($500) except when one hundred dollars ($100) in labor has been actually performed on such patented mine during the year* [we italicize], in addition to the tax upon the net proceeds; and also exempting such property as may be exempted by law for municipal, educational, literary, scientific or other charitable purposes."

It must be remembered that the assessment made by the assessor of Eureka County upon which taxes became delinquent and by reason of which certificate of sale and tax deed were ultimately issued to respondent was in 1909, some three years after the adoption of that amendment to section 1 of article 10 of the constitution last quoted. It is the contention of respondent here that inasmuch as no statute was enacted carrying out the provisions of this constitutional amendment until 1913, four years after the assessment of 1909, therefore the statute of 1905, enacted under the provisions of the former constitutional amendment providing for the assessment of patented mines on the basis of $10 per acre, was in full force and effect in 1909; and they support this contention by the assertion that the constitutional amendment of 1906, fixing the assessment of patented mines at not less than $500, was not self-executing and required some statute similar to that of 1913 to put the principle in operation.

Assuming the correctness of respondent's position as

to the operative effect of the constitutional amendment
of 1906, which question we deem unnecessary for deter-
mination, it does not to our mind strengthen their posi-
tion as supporting the validity of the assessment made
under the statute of 1905. It will not be contended that
the statute of 1905 would have been operative or effec-
tive for any purpose under the constitution of this state
before the adoption of the constitutional amendment of
1903. The statute of 1905 could only be effective under
the authority of the amendment to the constitution of
date last named. Moreover, the peculiar wording and
phraseology of the statute of 1905 is not to be over-
looked. This statute does not attempt in itself to direct
by specific language the assessment of patented mines
on the basis of $10 per acre. On the other hand, it
studiously avoided such language and pointed directly
to a section and an article of the constitution, naming
the date of its adoption, as being the law upon which
and by reason of which the statute itself would be man-
datory on the several assessors requiring them to assess:
"At the valuation placed upon them [patented mines]
by section 1 of article 10 of the constitution of the
State of Nevada as amended, etc." Did this statute have
operative vitality? Was it in force and effect after the
section of the constitution upon which it rested for that
vitality was by popular will abrogated and a new and
irreconcilable policy thereby set up in its stead? What-
ever might be said as to the force and effect of this
statute up to the time of the adoption of the amend-
ment of 1906, we are unable to find a rule that would
give it operative force in the absence of a saving clause
in the newly adopted constitutional provision or in some
other clause of the constitution itself some three years
after the adoption of the new constitutional provision,
which was in itself inconsistent and irreconcilable with
that statute.

Our position in this respect, based upon the doctrine
as we find it established, may be bluntly expressed thus:

The constitutional amendment of 1906, fixing a minimum valuation of $500 upon patented mines, absolutely nullified the statute of 1905, which, taking its authority from an abrogated constitutional amendment, fixed the valuation at the arbitrary figure of $10 per acre.

Statutes may be nullified, in so far as their future operation is concerned, by a constitution as well as by statute. (*Cass* v. *Dillon,* 2 Ohio St. 608.)  Indeed, it would be strange if it were otherwise.  The constitution is the direct, positive, and limiting voice of the people. It may establish a policy, fix a limit to legislation on a given subject, or prohibit specified acts as being performed by public servants.  As said by Mr. Justice Thornton, in the case of *Oakland Paving Co.* v. *Hilton:*

"In fact it is the solemn declaration of the paramount organic law operating on all departments of the government, expressed in the clearest and strongest language of prohibition.  No act can be done by any department contrary to its provisions.  It is a law absolutely controlling the legislative, executive, and judicial departments of the government.  It takes effect on laws already passed as well as to those to be enacted in the future." (*Oakland Paving Co.* v. *Hilton,* 69 Cal. 479, 11 Pac. 3.)

Our position here is based upon the doctrine which we find eminently supported by authority, to the effect that in the absence of a saving clause the adoption of a new constitution or the amendment of an old constitution operates to supersede and revoke all previous inconsistent, and irreconcilable constitutional and statutory provisions and rights exercised thereunder, at least so far as their future operation is concerned. (6 R. C. L.)

The Supreme Court of the United States, in dealing with the question of the effect of federal constitutional amendments on the existing constitutions and statutes of the several states, speaking through Mr. Justice Harlan, in the case of *Neal* v. *State of Delaware,* 103 U. S. 370, 26 L. Ed. 567, held, in substance, that the legal

effect of the adoption of amendments to the federal constitution and the laws passed for their enforcement was to annul so much of the state constitution as was inconsistent therewith.

The State of Pennsylvania, in adopting a new constitution, incorporated the provision that all preexisting laws not inconsistent with itself should continue in force. Prior to the adoption of this constitution, and prior to the establishment or ratification of the federal constitution, the State of Pennsylvania had a constitutional provision prescribing the requisites for the establishment of citizenship. The new constitution of Pennsylvania, passed after the act of Congress of 1799, is entirely silent on the subject of citizenship, save and except as it retained, by specific provision, preexisting laws not inconsistent with itself. In the case of *United States* v. *Villato,* 2 Dall. 370, 1 L. Ed. 419, the matter before the United States Circuit Court for the District of Pennsylvania turned upon the question whether the prisoner indicted for treason had become a citizen of the United States in consequence of the oath taken and subscribed by him on the 11th day of May, 1793, under the provisions of the former laws and constitution of Pennsylvania. The question was decided on the existence or nonexistence of the former law of citizenship of that state after the adoption of the new constitution, which, although it contained the provision that all preexisting laws should continue in force, was silent on the question of citizenship. One of the justices of the circuit court indulged in this language:

"The act of assembly is obviously inconsistent with the existing constitution of the state, and therefore cannot be saved by the general provision of the schedule annexed to it."

Another of the justices applied the same rule in different language, thus:

"The only act of naturalization suggested, depends upon the existence or nonexistence of a law of Pennsylvania; and it is plain that upon the abolition of the old

constitution of the state, the law became inconsistent with the provisions of the new constitution; and, of course, ceased to exist long before the supposed act of naturalization was performed."

Here was a case in which a given subject, namely, citizenship, was specifically dealt with by a provision of the former constitution of the State of Pennsylvania. At the time of the enactment of the new constitution of that state, what might be termed a saving clause was incorporated therein, which saving clause would seem to keep in force and effect preexisting laws not inconsistent with the new constitution. On the subject of citizenship, however, the new constitution made no mention; it was absolutely silent. The circuit court, in deciding the matter, specifically referred to the fact that the circumstances of the case rendered it unnecessary to inquire into the relative jurisdiction of the state and federal governments on the subject of citizenship, but decided the question rather in the light of the rule asserted in the quotations above set forth, and which by analogy we deem applicable here.

In the case at bar we find a former constitutional provision levying an arbitrary assessment in the way of taxation upon a specific character of property, and under the provisions of that constitution we find a statute enacted, which statute points to that constitutional provision for its operative force and effect. Some years later another constitutional provision is adopted dealing with the same subject as that dealt with in the former. The latter constitutional provision, however, not only nullifies, but absolutely abrogates and sets aside, the former constitutional provision; and under such conditions we are asked to hold in force and effect, without even the pretense of a saving clause, a statute enacted under the former constitutional provision, inconsistent with the latter. But the rule of law interwoven into the best-considered decisions is otherwise, and this rule is so well asserted and by such eminent authority that we cannot hesitate to apply it where, as

here, it appears so applicable. (6 R. C. L.) Again, referring to the contention that the newly amended section of the constitution was not self-executing, we may say that, even though such contention be conceded, the provision was, however, prohibitory in its character, inasmuch as it negatived the idea of the assessment of patented mines on a basis of less than $500 in valuation.

The principle to be applied here is aptly illustrated in the decision of the Supreme Court of the United States in the case of *Norton* v. *Board of Commissioners*, 129 U. S. 479, 9 Sup. Ct. 322, 32 L. Ed. 774. The constitution of the State of Tennessee, prior to March 26, 1870, contained this general provision:

"The general assembly shall have power to authorize the several counties and incorporated towns in this state to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to state taxation." (Const. 1834–35, art. 2, sec. 29.)

On the 8th day of February, 1870, the assembly of the State of Tennessee enacted a statute, under this provision of the constitution, authorizing the city of Brownsville to issue corporate bonds to the amount of $200,000 for railroad purposes, and further authorizing the corporate authority of the city of Brownsville to levy annually an assessment upon all the taxable property within the limits of the corporation sufficient to pay the annual interest on the bonds, and also to establish a sinking fund for the ultimate redemption of the bonds. On the 5th day of May, 1870, this constitutional provision of the State of Tennessee was by public vote amended by the addition of other sections, one of which provided:

"But the credit of no county, city, or town shall be given or loaned to or in aid of any person, company, association, or corporation, except upon an election to be first held by the qualified voters of such county, city, or town, and the assent of three-fourths of the votes

cast at said election. Nor shall any county, city, or town become a stockholder, with others, in any company, association, or corporation, except upon a like election, and the assent of a like majority."

Another section of the amendment read:

"All laws and ordinances now in force and in use in this state, not inconsistent with this constitution, shall continue in force and use until they shall expire, or be altered or repealed by the legislature."

The question before the Supreme Court of the United States was as to the effect of the constitutional amendment upon the act of the legislature passed prior to the adoption of that amendment. A consideration of the reasoning therein resorted to by the learned Chief Justice of the Supreme Court of the United States, keeping in mind its applicability to the point under consideration here, aids us in making our position more lucid. It was there pointed out, in the opinion written by Mr. Justice Fuller, that the inhibition contained in the constitutional amendment was self-executing as an inhibition, and although it might require a new and additional act of the legislature to put the full force and effect of the constitutional provision into operation, nevertheless the constitutional provision itself negatived the idea of the very thing provided for in the former legislative act, and hence prohibited the municipality from proceeding thereunder. The court there laid special emphasis upon the fact that, even though the new constitutional provision in its entirety was not self-executing, the *inhibition* set up by the amendment *was self-executing*. Thus the statute enacted on the 8th day of February, 1870, by the assembly of the State of Tennessee, conferring power, under a former constitutional provision, to a municipality to perform a specific act, although neither amended nor repealed, was made inoperative because the very thing which it authorized the municipality to do was prohibited by the constitutional amendment of May 5 of the same year. The court there refers to the principle laid down in the cases of *Concord* v.

*Portsmouth Savings Bank,* 92 U. S. 625, and *Railroad Company* v. *Falconer,* 103 U. S. 821, and draws attention to the distinction between the operation of a constitutional limitation upon the power of the legislature and of a constitutional inhibition upon the municipality itself. "In the former case," says the court, "past legislative action is not necessarily affected, while in the latter it is annulled. Of course, if an entirely new organic law is adopted, provision in the schedule or some other part of the instrument must be made for keeping in force all laws not inconsistent therewith. * * * But such a provision does not perpetuate any previous law enabling a municipality to do that which it is subsequently forbidden to do by the constitution."

So in the case at bar we say, assuming that parts of the constitutional amendment of 1906 required future legislation to put them in operation, that phase of the constitutional amendment of 1906 which established a minimum valuation to be placed as an assessment against patented mining claims specifically negatived the idea of a lesser valuation, and hence prohibited assessment of patented mining claims on the basis of $10 per acre. This prohibition was immediately self-executing, and required no statute to either emphasize its inhibition or to place it in operation. So the statute of 1905, which provided for an assessment of patented mines on the basis of a lesser valuation than that fixed specifically as a minimum by the constitutional amendment of 1906, although neither repealed nor amended by legislative act until 1913, became a nullity after the adoption of this constitutional amendment, inasmuch as its operation would be in direct contravention to the inhibition established by the amendment. It was undoubtedly the intention of the people of this state, when they adopted this constitutional amendment, to foster and encourage the mining industry of this state and to promote development of mineralized ground; and to that end they declared that patented mines should be exempt where the development or prospect work was

performed thereon, at least to the extent of $100, and, where no such labor was performed, the patented mine should be assessed for not less than $500.

3. Mr. Cooley, in his work on Constitutional Limitations, says:

"The object of construction, as applied to a written constitution, is to give effect to the intent of the people in adopting it. In the case of all written laws, it is the intent of the law-giver that is to be enforced. But this intent is to be found in the instrument itself. It is to be presumed that language has been employed with sufficient precision to convey it, and, unless examination demonstrates that the presumption does not hold good in the particular case, nothing will remain but to enforce it." (Cooley, Const. Lim. 6th ed. 69.)

The same principle may be found in application in the cases of *People ex rel. Decatur & State Line Ry. Co.* v. *McRoberts*, 62 Ill. 38, and *Mitchell* v. *I. & St. L. R. R. & C. Co.*, 68 Ill. 286.

4. This court in the case of *Goldfield Consolidated Mines Co.* v. *State*, 35 Nev. 178, 127 Pac. 77, had under consideration the construction and application of section 1 of article 10 of the constitution as amended in 1906, and there held that, where $100 worth or more of labor has been expended on a patented mining claim during any one year and prior to the time of assessment, the mine is exempt from taxation except on the proceeds thereof.

Following the decision in that case, it may be said that this section of the constitution sets up two distinct negatives, i. e., first, a patented mine cannot be assessed at less than $500 if the labor has not been performed; second, a patented mine on which the labor has been performed cannot be assessed at either more or less than $500—"is exempt from taxation except on the proceeds thereof." (*Goldfield Consolidated Mines Co.* v. *State*, supra.)

Counsel for respondent asks the question:

"Does this section of the constitution contain within

its own terms a complete rule of conduct protecting the right of exemption for $100 worth of work done upon a patented mining claim?"

We may answer this by saying that in this respect it makes no difference, because, if the labor was performed, assessment for any sum was prohibited; hence the assessment in this case would be void. If labor was not performed, the assessment for a sum less than $500 was prohibited; hence, the assessment in this case would be void. The case presented here emphasizes the rule that prohibitory provisions in a constitution are usually self-executing.

It is apparent that in either event above referred to a patented mine cannot, under the provisions of this section of the constitution and in the light of the rule of this court in the Goldfield case, *supra*, be assessed for less than $500. Here was a new provision in the organic law of the state, one that set up a prohibition which in itself required no legislation to execute; one that negatived future legislation as to the matter covered by the prohibition; one that nullified, repealed, and set aside the future efficacy of then existing legislation, provisions of which were in contravention to this prohibition. Here was a constitutional provision which with no uncertainty limited the assessment of patented mines by fixing a minimum less than which no assessment was to be valid. It requires no further citation of authorities than those we have herein set forth to support the proposition that any act which came within the prohibition was void, and any statute which sought to continue a policy expressly prohibited by this constitutional provision, whether enacted prior or subsequent to the adoption of the constitutional amendment, was, in the absence of a saving clause in the constitution itself, nullified. There can be no question, as we view the situation, that the statute of 1905 providing for the assessment of patented mines on a basis which fell within the specific prohibition of the constitutional amendment of 1906 was after the adoption of that

constitutional amendment nullified, repealed, and set aside as much so as though it had never existed.

5. The rule is stated and supported by authority that prohibitory provisions in a constitution are usually self-executing to the extent that anything done in violation of them is void. (6 R. C. L. 62; *State ex rel. Delgado* v. *Romero,* 17 N. M. 81, 124 Pac. 649, Ann. Cas. 1914C; 1114.) This doctrine was applied by the Supreme Court of California in a series of cases arising after the adoption of the new constitution of that state in 1879. The case of *Oakland Paving Co.* v. *Hilton, supra,* presents a question very much like that at bar, and it will be noted that in that case the court held that, when a constitutional provision is prohibitory in its language, no legislation is required to execute such provision; for it is then self-executing.

"Every constitutional provision," says the court, "is self-executing to this extent, that everything done in violation of it is void."

To the same effect we find the cases of *McDonald* v. *Patterson,* 54 Cal. 245; *Donahue* v. *Graham,* 61 Cal. 276; *Ewing* v. *Oroville Min. Co.,* 56 Cal. 649.

Counsel for respondent, in a masterful presentation by way of exhaustive brief, cite us to many eminent authorities relative to the subject at hand: *Griffin* v. *Rhoton et al.,* 85 Ark. 89, 107 S. W. 380; *Marshall* v. *Sherman,* 148 N. Y. 9, 42 N. E. 419, 34 L. R. A. 757, 51 Am. St. Rep. 654; *Southern Express Co.* v. *Patterson,* 122 Tenn. 279, 123 S. W. 353; *Davis* v. *Burke,* 179 U. S. 399, 21 Sup. Ct. 210, 45 L. Ed. 249; *Willis* v. *Mabon,* 48 Minn. 140, 50 N. W. 1110, 16 L. R. A. 281, 31 Am. St. Rep. 626; *Model Heating Co.* v. *Magarity,* 12 Boyce (Del.) 459, 81 Atl. 394, L. R. A. 1915B, 665; *French* v. *Teschemaker,* 24 Cal. 518. These authorities, as well as many others, support one great fundamental principle. This principle is best expressed in the language of Judge Cooley in his work on Constitutional Limitations wherein he says:

"A constitutional provision may be said to be self-

executing if it supplies a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed may be enforced; and it is not self-executing when it merely indicates principles, without laying down rules by means of which those principles may be given the force of law." (Cooley, Const. Lim., 7th ed. 121.)

In the case of *Davis* v. *Burke, supra,* relied upon by counsel, we note the significant language emphasizing the very thing we have heretofore mentioned. There Mr. Justice Brown, speaking for the Supreme Court of the United States, said:

"Where a constitutional provision is complete in itself, it needs no further legislation to put it in force. When it lays down certain general principles, as to enact laws upon a certain subject, or for the incorporation of cities of certain population, or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is self-executing only so far as it is susceptible of execution, but where a constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions."

Here is the line that distinguishes the case at bar. The section of the constitution under consideration prohibits a given act. In that prohibition it "lays down certain general principles; * * * it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provisions." In short, it is complete within itself to the extent of the prohibition. It is self-executing to the extent that it prohibits the taxation of patented mines for a less sum than $500.

The Supreme Court of Minnesota, in the case of *Willis* v. *Mabon, supra,* took occasion to make the following observation patent to the matter under consideration:

"A constitution is but a higher form of statutory law, and it is entirely competent for the people, if they so

desire, to incorporate into it self-executing enactments. These are much more common than formerly, the object being to put it beyond the power of the legislature to render them nugatory by refusing to enact legislation to carry them into effect. Prohibitory provisions in a constitution are usually self-executing to the extent that anything done in violation of them is void. * * * The question in every case is, whether the language of the constitutional provision is addressed to the courts or the legislature, does it indicate that it was intended as a present enactment, complete in itself as definitive legislation, or does it contemplate subsequent legislation to carry it into effect? This is to be determined from a consideration, both of the language used and of the intrinsic nature of the provision itself. If the nature and extent of the right conferred and of the liability imposed is fixed by the provision itself, so that they can be determined by the examination and construction of its own terms, and there is no language used indicating that the subject is referred to the legislature for action, then the provision should be construed as self-executing, and its language as addressed to the courts."

In the case at bar, a positive prohibition is found whereby the legislative, as well as the executive, branch of the government is bound, whereby the act of taxation of a given class of property is prohibited where such taxation is less than a given sum. Does not this indicate that it was intended as a present enactment complete in itself, as "definitive legislation"—a complete and positive prohibition? Does it contemplate subsequent legislation to carry it into effect? What legislation is necessary to emphasize that which prohibits a given act?

6. In determining when a constitutional provision is self-executing, we would distinguish between declarative constitutional limitation of legislative power on a given subject, within which limitation legislation might or should be enacted, and positive constitutional inhibition, which inhibition no legislative act could relieve or

modify. The former might require future legislation; the latter must, by reason of its very nature, be self-executing.

But again, respondent contends that inasmuch as it would require legislation to put in operation certain phases of section 1 of article 10 as amended, therefore nothing contained in the section was self-executing. But apply this reasoning to the same section as it was originally written and as it stood before it was amended in 1903; the section then prescribed:

"The legislature shall provide by law for a uniform and equal rate of assessment and taxation and shall prescribe such regulations as shall secure a just valuation for taxation of all property, real, personal and possessory, excepting mines and mining claims, the proceeds of which alone shall be taxed. * * *"

Here was a constitutional provision which in its entirety, according to respondent's theory, would require legislation to make completely operative. Indeed, legislation was by the very language of the section directed, but did it require any legislation to enforce the inhibitory clause "excepting mines and mining claims, the proceeds of which alone shall be taxed?" Could any amount of legislation more forcibly prohibit the taxing of this class of property? Was not this class of property exempted from taxation by the very language of the section itself? Was not this prohibition self-executing? Manifestly so. Apply this reasoning to the section of the constitution as it now stands, and in which, as we have already shown, in the light of the decision in the Goldfield Consolidated case, there is a specific prohibition under which patented mines are not to be assessed in any event for less than $500. Could any legislative language make this prohibition more forcible? Was any legislative language necessary to prohibit what the organic law already prohibited?

7. Reasoning as we do as to the force and effect of the statute of 1905 after the adoption of the constitutional amendment of 1906, the assessment made by the assessor of Eureka County of the Good Hope mining

claim and mill site, being based on a valuation of $10 per acre was void, inasmuch as an assessment of that character was made in the face of the strict inhibition of the constitution. It follows that, the act of assessment of the claim in the manner in which it was assessed by the authority of Eureka County being void, the sale which followed the delinquency was in itself void.

The statute of 1905 passed pursuant to the former constitutional amendment had been nullified by the constitutional amendment of 1906. It was of no more force and effect than though it had never existed. (*Oakland Paving Co.* v. *Hilton, supra.*) Hence any assessment made under its provisions or by its authority was as void as the statute itself.

Mr. Cooley, in his work on Taxation, 3d ed. vol. 2, p. 912, in discussing tax sales as being made exclusively under a statutory power, says:

"It is therefore accepted as an axiom, when tax sales are under consideration, that a fundamental condition to their validity is that there should have been a substantial compliance with the law in all the proceedings of which the sale was the culmination. This would be the general rule in all cases in which a man is to be divested of his freehold by adversary proceedings, but special reasons make it peculiarly applicable to the case of tax sales."

If this rule can be stated by the learned authority as being axiomatic with reference to the proceedings after the assessment, how much more so do they apply in a case where the assessment itself is made under a void statute; yea, more, made in the very face of a constitutional prohibition?

To the same effect are the following cases: *McLaughlin* v. *Thompson,* 55 Ill. 249; *Kemper* v. *McLelland's Lessee,* 19 Ohio, 308; *Gamble* v. *Witty,* 55 Miss. 26; *Hardenburgh* v. *Kidd,* 10 Cal. 402; *Riverside Co.* v. *Howell,* 113 Ill. 259.

8, 9. Respondent contends, and the trial court decided, that the action was barred by the statute of limitation;

and this constitutes the second, but not the secondary, proposition in the case. We turn first to our statute for answer to this contention, keeping in mind the fact that the property in question was real property, and that the sale was not pursuant to the judgment of any court, but was pursuant to prescribed statutory procedure.

Section 4946, Revised Laws, provides:

"Civil actions can only be commenced within the periods prescribed in this act, after the cause of action shall have accrued, except where a different limitation is prescribed by statute."

Section 4951, Revised Laws (section 9 of the Civil Practice Act), applicable to actions for recovery of mining claims, cited and relied upon by respondent in support of his contention, is as follows:

"No action for the recovery of mining claims, or for the recovery of the possession thereof, shall be maintained, unless it appear that the plaintiff, or those through or from whom he claims, were seized or possessed of such mining claim, or were the owners thereof, according to the laws and customs of the district embracing the same, within two years before the commencement of such action. Occupation and adverse possession of a mining claim shall consist in holding and working the same, in the usual and customary mode of holding and working similar claims in the vicinity thereof. All the provisions of this act which apply to other real estate, so far as applicable, shall be deemed to include and apply to mining claims; *provided,* that in such application 'two years' shall be held to be the period intended whenever the term 'five years' is used; *and provided, further,* that when the terms 'legal title' or 'title' are used, they shall be held to include title acquired by location or occupation, according to the usages, laws, and customs of the district embracing the claim."

It may be well here to note the words of the statute last quoted, which, if we followed the common and ordinary canons of construction, we cannot declare to be devoid of meaning or to be without the force and effect .

conveyed by the words therein taken in their usual and ordinary acceptation:

"All the provisions of this act, which apply to other real estate, so far as applicable, shall be deemed to include and apply to mining claims; *provided,* that in such application 'two years' shall be held to be the period intended whenever the term 'five years' is used."

With this provision in mind, we turn to those sections of this act which apply to other real estate as regards actions for the recovery thereof; and, without commenting on the significance of its position in the act, it will suffice to say that we find it in the next succeeding section, to wit, section 4952 of the Revised Laws, being section 10 of the act. It prescribes as follows:

"No cause of action, or defense to an action, founded upon the title to real property, or to rents, or to services out of the same, shall be effectual, unless it appear that the person prosecuting the action, or making the defense, or under whose title the action is prosecuted, or the defense is made, or the ancestor, predecessor or grantor of such person, was seized or possessed of the premises in question within five years before the committing of the act in respect to which said action is prosecuted or defense made."

It will be noted that by the provisions of section 4951 this section is made to apply to actions for the recovery of mining claims; and where the term "five years" is used, two years is to be understood as applicable to the last-named class of property.

We remember that section 4952 prescribes a limitation as to the time within which a cause of action or a defense to an action founded upon the title to real property shall be effectual; and, with this in mind, we inquire, Is there any provision of this act, or any other statute, which establishes an exception to the rule laid down by section 4952 affecting the time for the commencement of actions founded upon title to real property? And in answer to this we find section 4966, which reads as follows:

"If a person entitled to commence an action for the recovery of real property, or for the recovery of the possession thereof, or to make any entry or defense, founded on the title to real property, or to rents or services out of the same, be at the time such title shall first descend or accrue, either: 1. Within the age of majority; or, 2. Insane; or, 3. Imprisoned on a criminal charge, or in execution upon conviction of a criminal offense, for a term less than for life — the time during which such disability continues is not deemed any portion of the time in this chapter limited for the commencement of such actions, or the making of such entry or defense, but such action may be commenced or entry or defense made, within the period of two years after such disability shall cease, or after the death of the person entitled, who shall die under such disability, but such action shall not be commenced, or entry or defense made, after that period."   (Rev. Laws, 4966.)

This section applies as an exception to the specific provisions of section 4952, wherein the time for the commencement of an action founded upon the title to real property is fixed.   The rule established by section 4952, together with its exception as established by section 4966, applies to actions for the recovery of real estate; and the rule established by these two sections is by specific provision made to apply with equal force and effect to section 4951, because by the last-named section it is provided:

"All provisions of this act, which apply to other real estate, so far as applicable, shall be deemed to include and apply to mining claims; *provided,* that in such application 'two years' shall be held to be the period intended whenever the term 'five years' is used."

Hence, by interpolation, we read section 4951, Revised Laws, as follows:

"No action for the recovery of mining claims, or for the recovery of the possession thereof, shall be maintained, unless it appear that the plaintiff, or those through or for whom he claims, were seized or possessed

of such mining claim, or were the owners thereof, according to the laws and customs of the district embracing the same, within two years before the commencement of the action. * * * If a person entitled to commence an action for the recovery of a mining claim, or for the recovery of the possession thereof, or to make any entry or defense, founded on the title to a mining claim, or to rents or services out of the same, be at the time such title shall first descend or accrue, either: 1. Within the age of majority; or 2. Insane; * * * the time during which such disability continues is not deemed any portion of the time in this chapter limited for the commencement of such actions, or the making of such entry or defense, but such action may be commenced or entry or defense made, within the period of two years after such disability shall cease, or after the death of the person entitled, who shall die under such disability, but such action shall not be commenced, or entry or defense made, after that period."

In the case of *Treadway* v. *Wilder,* 12 Nev. 108, this court held that the statute of limitations, like any other statute, is to be construed according to the manifest intention of the legislature; and in ascertaining such intention the language used should be construed, if possible, according to the usual meaning of the words used.

Under a statute of Oregon, which in all essential particulars was the same as ours, the supreme court of the state, in a case involving the sale of real estate made pursuant to the terms of a father's will, as well as by court decree, held that under such a law an infant had fifteen years after the cause of action accrued in which to prosecute his action to recover real property, unless (as provided for in the Oregon law) he should become of age after ten years had elapsed and before the expiration of five years thereafter, in which case the time for the commencement of the action would be one year after the disability ceased. (*Northrop* v. *Marquam,* 16 Ore. 173, 18 Pac. 449.)

To the same effect is the·case of *Hulsman* v. *Deal,* 82 Kan. 518, 108 Pac. 849. In the last-named case the Supreme Court of Kansas, under conditions and statutory provisions somewhat similar to those presented in the matter at bar, supports the position we have taken here; and to the same effect is the case of *Kessinger* v. *Wilson,* 53 Ark. 400, 14 S. W. 96, 22 Am. St. Rep. 220. See, also, *Lanning et al.* v. *Brown,* 84 Ohio St. 385, 95 N. E. 921, Ann. Cas. 1912c, 772, and note.

The appellants in this action, Marie Wren and Thomas Wren, Jr., who appear by their guardian *ad litem,* were within the age of majority at all times and dates affected by this action. Applying to this case the force and effect of the several sections of our civil practice act quoted above, it follows that the statute of limitations has not run against their right of action.

10, 11. It is contended by respondent that inasmuch as the statute of limitations would have run against the administratrix of the estate of Thomas Wren, deceased, therefore the heirs of the said Thomas Wren, although minors during all of the time, were nevertheless directly affected by the same statute.

It has been repeatedly decided by the Supreme Court of California, under statutory provisions and procedure relative to the estates of deceased persons similar to that of ours, that the title to real estate vests in the heirs and devisees at the moment of the death of testator or intestate, subject only to the lien of the executor or administrator for the payment of the debts and expenses of administration, with the right in the administrator to present possession, which continues until the estate is settled or delivered over to the parties entitled by the order of the probate court. (*Beckett* v. *Selover,* 7 Cal. 215; *Meeks* v. *Hahn,* 20 Cal. 627; *Estate of Woodworth,* 31 Cal. 595; *Colton* v. *Onderdonk,* 69 Cal. 158.)

Holding to the same effect are the cases of *Murphy* v. *Crouse,* 135 Cal. 18, and *Bates* v. *Howard,* 105 Cal. 183.

The Supreme Court of Colorado, in the case of *Adams* v. *Slattery,* 85 Pac. 87, held to the effect that the realty

belonging to the estate of a deceased person descends directly to the heirs of the deceased, subject to the payment of the debts of the deceased, and that the administrator has no title or interest in the real estate except the rents thereof, and then only when it becomes necessary to have recourse to the real estate to pay the debts of the deceased.

Mr. Schouler, in his work on Wills, Executors, and Administrators, says:

"Real estate, at the common law, became vested at once on the death of the owner in his heirs or devisees, and the executor or administrator has as such no inherent power over it. * * * It is only as legislation or the will of a testator may have conferred an express power upon the executor' or administrator, that he can exert it in respect of real estate, unless authority has been conferred by the heirs or devisees themselves." (Schouler on Wills, Executors, and Administrators, 5th ed. vol. 2, p. 1199.)

This court in at least two instances has expressed itself to the same effect (*Price* v. *Ward,* 25 Nev. 203; *Gossage* v. *Crown Point Mining Co.,* 14 Nev. 156.)

Following, as it does, as a conclusion to be reached from the application of our statutory provision, in the light of decisions rendered under similar statutory provisions in other states, that the legal title to realty belonging to the estate of one deceased descends directly to his heirs, it follows then, as a matter of course, that the heirs of Thomas Wren, deceased, became at his death vested with the legal title to the Good Hope mining claim and mill site; and whatever may be said as to the statute of limitations running against the interest of Mary Wren, wife of the deceased, she being under no disability, it follows that the right to maintain an action to quiet title to the interest of the minor heirs, Marie Wren and Thomas Wren, Jr., is not barred to them by the statute of limitations.

The Supreme Court of California in the case of *Crosby* v. *Dowd,* 61 Cal. 557, had the identical question presented

here under consideration and under similar statutory provision, and the conclusion reached by that court in that instance, as well as the reasoning resorted to in arriving at that conclusion, will be found in support of the position we take here.

The respondent's strongest position, and one which requires most careful scrutiny in determining whether or not it applies to the case at bar, is that set forth in his contention that the administratrix was a trustee, and the minor heirs, Marie Wren and Thomas Wren, Jr., were *cestui que* trustents. Asserting this as the first proposition, they follow it up by a contention, supporting the same by a line of authorities, that whenever the right of action in a trustee is barred by limitation, the right of the *cestui que* trust is also barred, and respondent contends that this rule applies whether or not the *cestui que* trust be laboring under disability during the period of limitation. Many authorities are assigned by the respondent supporting the proposition which he asserts; indeed none more forceful than that contained in the decision of *Meeks* v. *Vassault,* 3 Sawy. 206, Fed. Cas. No. 9393, affirmed in the decision of the Supreme Court of the United States, *Same* v. *Olpherts,* 100 U. S. 564, 23 L. Ed. 735. (*Harlan* v. *Peck,* 33 Cal. 515, 91 Am. Dec. 653; *Jenkins* v. *Jensen,* 24 Utah, 108, 66 Pac. 773, 91 Am. St. Rep. 783; *Dennis* v. *Bint,* 122 Cal. 39, 54 Pac. 378, 68 Am. St. Rep. 17; *Patchett* v. *Pacific Coast Ry. Co.,* 100 Cal. 505, 35 Pac. 73; *Williamson* v. *Beardsley,* 137 Fed. 467, 69 C. C. A. 615.) A correct statement of the rule applied by these authorities last referred to emphasizes two principal elements which distinguish the cases relied upon by respondent from that at bar. As a general proposition, we think the rule is that, whenever the right of action in a trustee who is vested with the legal title and competency to sue is barred by limitation, the right of the *cestui que* trust is also barred.

We have already dwelt on the proposition that under a line of authorities rendered in the light of statutes similar to ours, and under the decisions of this court, the

legal title to the real estate of one deceased vests in his heirs. (*Price* v. *Ward,* 25 Nev. 203, 58 Pac. 849, 46 L. R. A. 459; *Gossage* v. *Crown Point Mining Co.,* 14 Nev. 156.) Hence the line to be drawn which would distinguish the case at bar from that line of cases exemplified in the decision of *Meeks* v. *Olpherts,* 100 U. S. 564, 23 L. Ed. 735, is one which rests primarily upon the question in whom is the legal title. In other words, if the trustee be vested with the legal estate or title, and while so vested is competent to sue, the statute of limitation running against the trustee will also run against the *cestui que* trust, but if the legal title be in the *cestui que* trust, the statute of limitation which might run against the trustee will not constitute a bar against the former if he be under disability during the period of limitation.

In this respect it may be well to note that the case of *Meeks* v. *Vassault, supra,* decided by the Supreme Court of the United States, was a matter arising under a probate sale; and there the court especially dwelt upon the right of action which might be maintained by the heirs of the estate against the bondsmen of the administrator.

In the case of *Harlan* v. *Peck, supra,* referred to in the case of *Meeks* v. *Vassault, supra,* the matter grew out of a probate sale made pursuant to an order of a court of competent jurisdiction and pursuant to statutory provision.

In the case of *Jenkins* v. *Jensen, supra,* the court had under consideration a matter involving trust deeds investing the trustees with the legal title to the realty under the peculiar restrictions set forth in the deed.

In the case of *Dennis* v. *Bint, supra,* the question involved was the sale of real estate by the administrator following an order made by the court having jurisdiction in probate proceedings. The decision there referred approvingly to the case of *Meeks* v. *Olpherts, supra,* and to *McLeran* v. *Benton,* 73 Cal. 329, 14 Pac. 879, 2 Am. St. Rep. 814. The decision in the case, as did the decision in the cases therein referred to, turned upon

the proposition that under the statutes of California the administrator, for the purpose of making the sale under the order of the court in probate proceedings, was the trustee and the heirs were the *cestui que* trustents.

In the case of *Patchett* v. *Pacific Coast Ry. Co., supra,* the trustee held a legal title by and through a deed.

In the case of *Williamson* v. *Beardsley, supra,* the question of a sale pursuant to an order of a court during probate proceedings was before the court for determination. There, as in the other cases, the title for the purpose of the sale was in the executor, he being the trustee, the heirs being the *cestui que* trustents.

In Wood on Limitations the author cites the rule which we desire to impress by reason of its importance in assisting us to distinguish the matter at bar:

"When the legal title of property is vested in a trustee who can sue for it, and fails to do so within the statutory period, an infant *cestui que* who has only an equitable interest will also be barred; but the rule is otherwise when the legal title is vested in the infant, or cast upon him by operation of law. * * *"

Continuing on the subject, the author states that, if the *cestui que* trust was ignorant of the sale and the purchaser knew of the trust, the *cestui que* trust will not be barred. (Wood on Limitations, 2 ed. vol. 2, p. 522, sec. 208.)

Section 5950, Revised Laws, being section 94 of the civil practice act, provides:

"The executor or administrator shall have a right to the possession of all the real as well as personal estate of the deceased and may receive the rents and profits of the real estate until the estate shall be settled or until delivered over by order of the district court to the heirs or devisees, and shall keep in good tenantable repair all houses, buildings, and fences thereon which are under his control."

In the case of *Gossage* v. *Crown Point Mining Co., supra,* this court, speaking through Mr. Justice Hawley, referred with approval to the decision of the Supreme

Court of Michigan, which, in passing upon a statute similar to ours, held that the right of possession of real property belonging to an estate is in the heir until the executor or administrator takes possession or otherwise claims his right under the statute. (*Streeter* v. *Paton,* 7 Mich. 341; *Marvin* v. *Schilling,* 12 Mich. 356; *Champau* v. *Champau,* 19 Mich. 116.)

Further observing, the court says:

"All the decisions in the respective states, where the question is alluded to, concede the proposition that, in construing this section of the statute, the entire probate system relative to the settlement of the estates of deceased persons, as well as the statute concerning descents and distribution, must be considered. There cannot be any controversy as to the correctness of this general rule. The rights of the relative parties ought always to be considered, and such an interpretation given as would afford the protection intended to be reached by the legislature."

The decision of this court in the case of *Gossage* v. *Crown Point M. Co., supra,* is decisive of a matter relative to the application of our statute which we deem of vital importance in arriving at a correct conclusion on the matter at bar. This court there approved the reasoning found in the case of *Streeter* v. *Paton, supra,* to the effect:

"The object of this particular section of the statute was to prevent injustice to creditors, and to have the rents as well as the proceeds of the sale of the real estate applied to the payment of debts; * * * the language * * * is not imperative, but gives a right which the administrator or executor may or may not exercise; * * * it is the duty of the personal representative to take possession of the real estate, when it, or the rents and profits, may be needed in the settlement of the estate, but when this is not the case, although he may do so under the statute, it is not imperative on him; * * * there is no valid reason why it should be imperative. * * * The personal estate may be more than ample

for all purposes of administration and years may be required in settling the estate; * * * it would be a harsh construction of the statute that would deprive the heir of his inheritance in the meantime."

Speaking on the question of the right of the heirs to maintain an action in ejectment in their own name, the court said:

"They are the real parties in interest. They alone will be benefited or injured, as the case may be, by the result of the suit. There are no creditors to be affected. No costs or debts of any kind outstanding against the estate. Neither is there any existing equity of any character in favor of the administrator. Moreover, if any legal or equitable right existed in his favor, he has waived the same in favor of the heirs. If any objection, therefore, exists against the right of the heir to maintain this suit, it must be found in the plain language, spirit, and intent of the statute. There is no other reason that could be advanced why the heirs should be compelled to go through the formula and delay of procuring the appointment of a special administrator."

12. Hence we find that in no uncertain terms we have determined not only that the realty in the estate of one deceased vests immediately in his heirs (*Price* v. *Ward, supra*), but, moreover, that even where an administrator or executor has been appointed, and the estate is in course of probate, it is the right of the heirs to maintain an action as against third persons for the possession of the realty.

In the case of *Meeks* v. *Olpherts, supra,* the Supreme Court of the United States, in deciding whether or not the statute of limitations would run against an heir under legal disability, looked directly to the decision of the Supreme Court of California in the case of *Harlan & Huff* v. *Peck,* 33 Cal. 515, and in the light of the decision of the highest court of that state in the last-named case held:

"The disability cannot have reference to a person in whom no right of action exists. * * * The right

of action on the title which the plaintiff now asserts was in the administrator, and the statute therefore ran against him and against all whose rights he represented. 'In all suits for the benefit of the estate he represents both the creditors and the heirs,' said the Supreme Court in *Beckett* v. *Selover,* 7 Cal. 215."

The highest court of this state, following a line of Michigan cases, has taken a contrary view as to the matter last quoted, and, in construing our statutory provisions in the light of the policy sought to be carried out as made manifest by our legislative enactments, has determined that an action might be maintained by the heirs in their own name where they sought to secure to themselves possession of the realty as against third parties. Hence, the assertion made by the Supreme Court of the United States in the case of *Meeks* v. *Olpherts, supra,* that "the disability cannot have. reference to a person in whom no right of action exists," does not apply to minor heirs in a case like the one at bar. Rather do we apply the doctrine laid down by that court in the same opinion, wherein it said:

"The legal disability mentioned in section 191 [Civil Code Cal.] manifestly has reference to a well-known class of persons in whom a right to redress exists, but who for special reasons are incapable of acting for themselves; such as infancy, coverture, and the like. Whatever is a disability under the general statute of limitations is a disability under this statute."

The property in question here had never been taken possession of by the administratrix, if we read the record aright. It was, nevertheless, realty which belonged to the estate of Thomas Wren, deceased; realty which passed directly to his heirs in the event of his death. Two of these heirs were at that time, as well as at the time of the commencement of this action, minors. Had these heirs been laboring under no disability, it would, in the light of the decision of this court in *Gossage* v. *Crown Point Mining Co., supra,* have been their right and privilege to institute an action in their own name

to quiet title to the property. But these heirs, Marie Wren and Thomas Wren, Jr., were at the time of their father's death, as well as at the time of the commencement of this action, minors; hence laboring under a legal disability. Had these heirs been free from this disability, they might have instituted this action at any time within two years from and after the date of the tax sale at which this respondent alleges he acquired title to the property in question. But the statute of this state (Rev. Laws, 4951–4966) provides that by reason of this disability this action, which, under the decision of this court in the case of *Gossage* v. *Crown Point Mining Co.*, *supra*, was theirs, had they been of legal age, may be commenced by them within a period of two years after their disability has ceased.

The cases of *Meeks* v. *Olpherts* and *Meeks* v. *Vassault*, *supra*, are earnestly relied upon by respondent in furtherance of his position here. But, in the light of the decision of this court heretofore referred to and in view of our statutory provision, that decision is distinguishable in view of assertions there made and the reasoning resorted to. The court there says:

"Under the statutes of California, real estate, like personalty, is assets in the hands of the administrator, and is to be administered, and applied first to the payment of the expenses of the administration and debts of the deceased, and then the residue, after satisfying all lawful claims, distributed to the heirs. Realty and personalty stand upon the same footing, except that the personalty must be first exhausted before the real estate can be sold and applied to payment of the debts of the deceased. The right of possession, and right of action to recover possession of the real estate, vests exclusively in the administrator. The heirs cannot maintain an action to recover the real estate pending the administration, or after the administration has been commenced, until the estate has been settled, or the real estate has been distributed to them by the probate court." (*Meeks* v. *Vassault*, 3 Sawy. 212, Fed. Cas. No. 9393.)

Such cannot apply here, in view of the decision of this court in the case of *Gossage* v. *Crown Point Mining Company, supra.*

Again, in the Meeks-Vassault case the court said:

"The cause of action had accrued, but it was in the administrator, and had not yet passed to the heir. There was, however, a party in existence competent to sue, one to whom the law gives the right, and upon whom it imposes the duty to sue. This party is the administrator who is the trustee of the estate, and who for this purpose represents both the heirs and the creditors of the estate. He represents the title."

Again, we say, this reasoning must fall before the force and effect of the decision of this court in the case of *Gossage* v. *Crown Point Mining Co., supra.*

But these several lines of reasoning resorted to in the Meeks-Vassault case cannot avail in this case for any reason. The court there, in speaking of the remedy remaining in favor of the heirs, used the following significant language:

"Whether as effective as desirable or not, the heirs are not without a remedy. They have a remedy against the administrator and upon the administrators' bond; and they may, in a proper proceeding, also compel the administrator to sue."

The reasoning and conclusion arrived at in these cases by the Supreme Court of the United States and by the learned Circuit Court of Appeals cannot avail in the case at bar, first, because a conclusion different from that of the Supreme Court of California, referred to in the Olpherts case, has been arrived at by the highest court of this state as to the right of the heirs to maintain an action in their own name, for the possession of realty belonging to the estate, as well as for another reason.

13. Section 5911, Revised Laws, being section 55 of our Civil Practice Act, provides:

"Every person to whom letters testamentary ·(unless the will otherwise provides) or of administration shall have been directed to issue shall, before receiving the

letters, execute a bond to the State of Nevada, with two or more sureties to be approved by the district judge. In form the bond shall be joint and several, and the penalty shall not be less than the value of the personal property, including rents and profits belonging to the estate, which value shall be ascertained by the court by the examination on oath of the party applying, and of any other persons the judge may think proper to examine. The district judge shall require an additional bond whenever the sale of any real estate belonging to an estate is ordered by him to be sold. The bond shall be conditioned that the executor or administrator will faithfully execute the duties of the trust according to law, and shall be recorded by the clerk."

It will be noted that in this section the penalty provided for in the bond is fixed at not less than the value of the personal property, including rents and profits belonging to the estate. It is only when the sale of any real estate belonging to the estate is ordered by the district judge that an additional bond is required under this statutory provision. Under the latter condition only, a bond is required from the executor or administrator to insure that he "will faithfully execute the duties of the trust according to law." Hence, as we read this provision of our statute, and viewing it in the light of the general policy which we find established by the legislature applicable to the settlement of the estates of deceased persons, it is made manifest to us that the relationship of trustee and *cestui que* trust between the executor or the administrator and the heirs is not created by our statute in so far as the same might apply to the realty belonging to an estate. For this reason, the rule that would assert that a statute of limitations running against a trustee who holds the legal title to real estate runs also against the *cestui que* trust, does not apply.

The disability which prevented the statute of limitation from running as against the minors, Marie Wren and Thomas Wren, Jr., does not effect the same result as

with reference to Mary Wren in her own right nor to Mary Wren as administratrix. She was laboring under no such disability, and the statute as to the time during which actions might be commenced operates as a bar to her right of action here inasmuch as the period during which such actions could have been commenced has long since passed.

14. Counsel for appellants here contend that the statute of limitations governing the commencement of actions of this character has not run against the appellant, Mary Wren. In this respect they contend that section 4951, Revised Laws, does not apply, inasmuch as the property in question here was a patented mining claim. In this respect they argue that the term "mining claim" as used in section 4951 and in the exception to section 4953, refers to unpatented mining claims; that the time within which to commence an action for the recovery of a patented mining claim is governed by section 4952, Revised Laws, and hence this action might have been commenced at any time within five years from and after the date at which appellant Mary Wren was last seized or possessed of the premises, to wit, December, 1909.

The contention of appellants in this respect might be more serious were it not for the fact that the history of legislation as we find it in this state will scarcely support their position.

The first act of Congress providing for the patenting of a mining claim was passed in the year 1866. (U. S. Stat. L., 1866, p. 262; *Golden* v. *Murphy,* 31 Nev. 410.)

Section 4951, Revised Laws, was first enacted by our legislature in 1867. (Stats. 1867, p. 85.)

Section 4953, Revised Laws, was first enacted in 1869. (Stats. 1869, p. 95.)

These enactments were carried forward in their original form, by continuation, into our Revised Laws. (Rev. Laws, 5817.)

Each of these provisions of our code refers to mining claims as such, and this notwithstanding the passage of

the federal statute of 1866 providing for the patenting of such property. If the legislatures of 1867 and 1869 had intended that patented mining claims should not be affected by the provisions of this statute, we may assume that some expression to that effect would be found in the statute. Finding none, we must conclude that the legislature, when enacting these provisions, did so with full knowledge of the federal statute of 1866 providing for the patenting of mining claims, and hence intended that the force of these sections should apply to patented as well as unpatented mining claims, and that actions for the recovery of mining claims or for the recovery of the possession thereof must be commenced within two years from the time at which the plaintiff or those through or from whom he claims were seized or possessed of such mining claim, whether the same be patented or unpatented.

15. But it is contended that, inasmuch as respondent here has since 1910 been in open, notorious, and exclusive possession of the property in question, he therefore has acquired the same by adverse possession. As regards this latter contention, the minor heirs were entitled to notice of the hostile character of respondent's claim. This notice could not be given or imparted to the minor heirs until they were capable in law of receiving it. Their infancy made it impossible under the law to charge them with notice of the character or extent of respondent's claim of adverse possession, much less of the nature of the title under which respondent entered. To this notice they were entitled; and under the provision of our statute they had the right to commence this action at any time within two years after they were by law chargeable with notice. (*Northrop* v. *Marquam, supra.*)

The doctrine that statutes of limitation usually except infants from their operation has received eminent sanction. (1 R. C. L. 759.)

The judgment appealed from must be reversed, in so far as it affects Marie Wren and Thomas Wren, Jr., and

as to these appellants it is ordered that judgment be entered in accordance with the prayer of their complaint, to the extent of their interest in the property as heirs at law of Thomas Wren, deceased.

As to the appellant, Mary Wren, the judgment is affirmed.

## ON PETITION FOR WRIT OF ERROR TO THE UNITED STATES SUPREME COURT

By the Court, McCARRAN, C. J.:

The earnestness with which this petition for writ of error was presented has caused me to give it more than usual attention. Especially is this true in view of the fact that a similar application may be made to any of the justices of the Supreme Court of the United States.

1, 2. It must be understood that in the first instance no federal question or matter of which the federal court would take cognizance was presented to this tribunal. It was only on petition for rehearing that a federal question was suggested. The Supreme Court of the United States has on a number of occasions laid down the rule that to suggest or set up a federal question for the first time in a petition for rehearing in the highest court of the state is not in time. (Encyclopedia of United States Supreme Court Reports, vol. 1, p. 624.) Petitioner here contends that the authorities supporting the text here cited are not pertinent or binding in the matter at bar, inasmuch as the federal question sought to be raised was not in existence until after the filing of our opinion and decision. In other words, petitioner contends that by the decision of this court the federal question was created.

This case was tried in the court below, and came to this court upon an agreed statement of facts, one phase of which was that defendant, respondent here, held the property in question by adverse possession as against appellants, and the agreed statement of facts in that respect sets forth as follows:

"That immediately after the receipt by the said Thomas Dixon of the certificate of sale of said patented mine and mill site for the nonpayment of taxes for the year 1909, he, the said Thomas Dixon, defendant herein, entered into the possession of said patented mine and mill site, and has remained in the actual, continued, open, notorious, and exclusive possession thereof, claiming the same adversely to all persons, since the month of January, 1910; that during the years 1910, 1911, 1912, and 1914 the county assessor assessed said property, to wit, said patented mine and mill site, to the defendant herein in the manner provided by law, and the defendant herein paid all of the taxes so levied and assessed against the said property for the years 1910, 1911, 1912, and 1914 to the county treasurer and ex officio tax receiver of Eureka County, State of Nevada."

Here was an agreed statement of a fact, the elements of which were intended to support the claim of adverse possession. This statement of fact, couched in the language in which we find it, asserting possession in the respondent, Dixon, precluded the idea of possession in the appellant Mary Wren, either as an individual or in her official capacity as executrix. This statement was to my mind sufficient to warrant the assertion found in the opinion of this court that the property in question here had never been taken possession of by the executrix. If possession had ever been taken of the property by the executrix, the record is silent, save and except that by this statement of fact it is said that, if possession had ever been taken of the property by the executrix, it was at a time so far remote that the statute of limitation had run in establishment of adverse possession in favor of the respondent. Absence of possession by the executrix was the basis of one of the defenses urged by petitioner.

The assertion of this court to the effect that the executrix had never taken possession of the property was, as I view it, but minor and insignificant; however, it did

not go beyond the record for the fact asserted. The assertion of this court in this respect may, in my judgment, be said to rest squarely upon the agreed statement of fact as to the actual, continuous, open, notorious, and exclusive possession of the respondent.

It is my conclusion: First, that there being no federal question presented to this court in the first instance, the suggestion of such comes too late on petition for rehearing; secondly, this court in making the assertion that the property in question had never been taken possession of by the executrix did not go outside the record, but, even should it be conceded, for argument's sake, that in making this assertion this court did find beyond the record, the final conclusion and judgment of the court did not turn upon that assertion, nor was the assertion a vital or essential element in arriving at the conclusion which led to the judgment in this case. In other words, the law as laid down in the opinion and decision warranted the conclusion arrived at, regardless of the question as to possession by the executrix.

Petition for a writ of error is denied.