ORR DITCH AND WATER COMPANY, a Corporation, Petitioner, v. THE JUSTICE COURT OF RENO TOWNSHIP, COUNTY OF WASHOE, STATE OF NEVADA, Et Al., Respondents.

No. 3474

March 18, 1947.                    178 P.2d 558.

*Kearney & Adams,* of Reno, for Petitioner.

*Thatcher, Woodburn and Forman* and *Charles M. Merrill,* all of Reno, amici curiæ, in support of application for writ.

*Harlan L. Heward, Oliver C. Custer* and *Bruce R. Thompson,* all of Reno, for Respondents.

*C. Lester Zahniser,* of Sparks, amicus curiæ, in opposition to issuance of writ.

## OPINION

By the Court, HORSEY, J.:

This proceeding is an application for prohibition to arrest certain proceedings pending in the justice court of Reno township, county of Washoe, State of Nevada, which were instituted under the provisions of an act passed in 1866, entitled "An Act to secure persons and animals from danger arising from mining and other excavations." Statutes of Nevada 1866, pp. 59–61, N.C.L.1929, secs. 5630–5635.

Proceedings under said act were commenced in the respondent court by the filing of a notice (exhibit A attached to said application) by Harlan L. Heward, a

private citizen, in which a violation of the act was claimed in that a certain portion of the Orr ditch, situated in the city of Reno and described therein and alleged to be an excavation, is dangerous to persons and has been left and is being worked contrary to the provisions of said act. Specifically, it is contended by the said Harlan L. Heward that said portion of said ditch is an excavation within the meaning of said act, and that the same has not been fenced or otherwise safeguarded as required by the provisions of the act.

Upon the filing of the notice, the justice of the peace of said township made an order directing the service of notice upon the petitioner. A notice (exhibit C) was thereupon served upon the petitioner, who appeared and filed a demurrer in the respondent court. The demurrer was argued and overruled, whereupon petitioner applied to this court for an alternative writ of prohibition, and an order directed to respondents requiring them to show cause why the alternative writ should not be made permanent. Such alternative writ was issued by this court December 9, 1946, and the respondents were commanded to desist and refrain from all further proceedings in said matter, and that they, and each of them, show cause before this court, on the 20th day of December 1946, why they should not be absolutely and permanently restrained from taking any further proceedings in said matter entitled "State of Nevada, Plaintiff, v. Orr Ditch and Water Company, a Corporation, Defendant," case No. 4479 in the justice court of Reno township, county of Washoe, State of Nevada.

The hearing of arguments in said proceeding in this court was set for the 9th day of January 1947.

On the 31st day of December 1946 the defendants interposed a demurrer to the application of petitioner, alleging in substance that the said application does not state facts sufficient to entitle said applicant to the relief prayed for in said application, nor to a peremptory writ of prohibition herein.

The hearing was had in this court under the said

show-cause order on said 9th day of January 1947. The demurrer to said application was argued by respective counsel on behalf of petitioner and respondents, and the matter was thereupon submitted to this court for decision upon said demurrer, and should same be overruled for decision as to whether the writ should be made permanent.

The petitioner contends that irrigation ditches are not within the meaning of the word "excavations," as employed in said act; that such ditches are not within the terms of the act requiring that shafts, excavations, and holes be fenced, or otherwise safeguarded, and that respondents were without jurisdiction to proceed. The petitioner also contends that the act of 1866 is unconstitutional in several alleged particulars, and for that reason also the respondent court was without jurisdiction.

The respondents, on the other hand, contend that the term "excavations," if broadly and properly construed, includes irrigation ditches, and that the act is constitutional.

We will at this point endeavor to determine, first, the meaning of the word "excavations," as employed in said act of 1866. In what sense did the legislature use the word, and what meaning did the legislators intend it should have? Ditches are not mentioned in the act. If included, it must be by construing the word "excavation," as used in the act, to include within its purview an irrigation ditch.

Webster's Standard International Dictionary defines the word "excavation" as follows:

"1. Act or process of excavating.

"2. A cavity formed by cutting, digging or scooping.

"3. Engin. a An uncovered cutting in the earth, in distinction from a covered cutting or tunnel."

The word "excavate" is, in said dictionary, defined as:

"1. To hollow out; to form a hole or cavity in; to make a hallow by cutting, scooping or digging; as, to excavate a hill or a tooth.

"2. To form by hollowing; to shape, as a cavity, or anything that is hollow; as, to excavate a cellar or tunnel."

In Funk and Wagnall's New Standard Dictionary, the word "excavation" is defined as follows:

"1. The act or process of excavating, a making hollow or cleaning out by digging, scooping or cutting.

"2. A cavity or hollow formed by scooping, cutting or digging.

"Engin. An open earth-cutting, as distinguished from a tunnel."

The word "excavate" in said dictionary is defined as follows:

"1. To make a hole or cavity in; hollow out; scoop, dig or cut a hollow in; as, to excavate an ancient mound; to excavate a tooth for filling.

"2. To form or make by hollowing, digging out or scooping, as to excavate a tunnel.

"3. To remove by digging or scooping out, or to uncover by this process; as, to excavate earth from a cellar; to excavate a statue from the ruins of a temple."

As pointed out by Mr. Merrill, amicus curiae, in his reply brief, it would seem fair to say that there are two principal meanings applied to the word "excavation":

1. A cavity or hole, as, to excavate a hill or a tooth.

2. An uncovered or open cutting in the earth, as distinguished from a tunnel.

The latter definition is designated by both the above-mentioned dictionaries as the engineering definition, indicating that the former is the ordinary definition, or the one usually employed.

It is apparent, therefore, that there is a vast difference between the scope of the ordinary definition and the engineering or scientific definition. The former, if applied to the word "excavation" in said statute of 1866, would exclude irrigation ditches, as they are not a cavity or a hole, as to excavate a hill or a tooth.

Such a cavity or hole has an opening at the point of entrance, such as the portal of a tunnel or the collar of

a shaft or prospect hole. An irrigation ditch, in its natural state, is an uncovered or open cutting in the earth without a portal or collar, or other point of entrance, and comes clearly within the engineering or scientific definition.

It is apparent, therefore, that from the standpoint of the two definitions above mentioned, we are confronted by an ambiguity existing as to the meaning of the word "excavation" as employed in said statute of 1866, which must be resolved by this court. This requires us to construe the act, and particularly the meaning of the word "excavation" as employed therein, in order to determine whether irrigation ditches were, by the legislature, intended to be included within the provisions of the act requiring the erection of "good and substantial fences, or other safeguards, * * * around such works or shafts, sufficient to securely guard against danger to persons and animals, from falling into such shafts or excavations."

The title of said act, approved February 8, 1866 is: "An Act to secure persons and animals from danger arising from mining and other excavations." Section 1 of the act is as follows: "§ 1. Any person or persons, company or corporation, who shall hereafter dig, sink, or excavate, or cause the same to be done, or being the owner or owners, or in the possession under any lease or contract of any shaft, excavation, or hole, whether used for mining or otherwise, or whether dug, sunk or excavated, for the purpose of mining, to obtain water, or for any other purpose, within this state, shall, during the time they may be employed in digging, sinking, or excavating, or after they may have ceased work upon or abandoned the same, erect, or cause to be erected, good and substantial fences, or other safeguards, and keep the same in good repair, around such works or shafts, sufficient to securely guard against danger to persons and animals, from falling into such shafts or excavations."

Counsel for the petitioner insist most earnestly that

the rule of ejusdem generis should be applied; that the word "excavation," a general term placed in the statute in section 1, between the word "shaft" and the word "hole," which are words of specific meaning and clearly mean an excavation of the pit or cavity type, as distinguished from an open cutting in the earth, should be characterized by the meaning of the more specific words "shaft" and "hole"; that the former, thus characterized by its context, should be restricted or confined in its meaning to excavations of the same class or kind as shafts or holes.

On the other hand, counsel for respondents contend that the word "excavation" is not necessarily to be thus restricted; that in its literal sense it is an all-embracive word, and considering the broad objective of the act, namely, "to secure persons and animals from danger arising from mining and other excavations," that any form of excavation, including irrigation ditches, which, if unsafeguarded, are dangerous to persons or animals from falling into them, should be deemed to be within the meaning of the said word.

Counsel for petitioner, and particularly Mr. Merrill, amicus curiæ, have thoroughly analyzed the meaning, and particularly the differences in meaning of the words "shaft" and "hole," and words of similar import or class, on the one hand, and the word "ditches," on the other. These differences relate not only to the shape, usual dimensions and the danger inherent in, or connected with, the two distinct general types of excavations, but also include the fact that in the instance of shafts, holes, or excavations of similar type, the danger is solely from the falling into them and the violent contact and concussion resulting from such fall, whereas, in the case of ditches, the danger inherent in them as excavations alone is slight—that the danger is not from falling and its immediate effect, but from drowning, which is, as they contend, caused primarily by the water in the ditches.

It will be observed that the statute employs the words,

"danger \* \* \* *from falling into* such \* \* \* excavations," and says nothing as to any concurring cause such as water or drowning therefrom, which omissions to some extent seem to support petitioner's contention in favor of the application of the rule of ejusdem generis. (Emphasis mine.)

■ Indeed, it would seem that the rule of noscitur a sociis, as well as the rule of ejusdem generis, may be appropriately applied in the instant case. The context surrounding the word "excavation" in the statute, especially its close association with the word "shaft" and "hole," clearly of the pit type of excavation, and the words "around such works or shafts," following in the same section of the act, would seem to give color to and reflect light upon the intended meaning of the word "excavation."

The doctrine of noscitur a sociis is stated as follows in 50 Am.Jur., sec. 247, pp. 241–243: "§ 247. Generally.—The meaning of statutory terms depends upon the connection in which they are used, and in the interpretation thereof, the doctrine of construction, noscitur a sociis, prevails. Hence, the meaning of particular terms in a statute may be ascertained by reference to words associated with them in the statute. Where two or more words of analogous meaning are employed together in a statute, they are understood to be used in their cognate sense, to express the same relations and give color and expression to each other. It is also a familiar policy in the construction of terms of a statute to take into consideration the meaning naturally attaching to them from the context, and to adopt that sense of the words which best harmonizes with the context. Thus, although words and sentences, or parts of sentences, have no very definite signification in their ordinary use, if a particular meaning and application appears from their use or connection in the statute, that meaning and application must be accepted as proper and controlling. Indeed, it is improper, in construing a statute, to take

a few words from its context, and, with them thus isolated, attempt to determine their meaning. Moreover, court may not, in order to give effect to particular words, virtually destroy the meaning of the entire context. In some cases, the rule that the meaning of statutory terms is determined by their context is recognized by statute."

And the rule ejusdem generis follows in sec. 249, pp. 244–246, and is as follows: "§ 249. Limitation of General Words by Specific Terms.—General and specific words in a statute which are associated together, and which are capable of an analogous meaning, take color from each other, so that the general words are restricted to a sense analogous to the less general. Under this rule, general terms in a statute may be regarded as limited by subsequent more specific terms. Similarly, in accordance with what is commonly known as the rule of ejusdem generis, where, in a statute, general words follow a designation of particular subjects or classes of persons, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designation and as including only things or persons of the same kind, class, character, or nature as those specifically enumerated. The general words are deemed to have been used, not to the wide extent which they might bear if standing alone, but as related to words of more definite and particular meaning with which they are associated. In accordance with the rule of ejusdem generis, such terms as 'other,' 'other thing,' 'other persons,' 'others,' 'otherwise,' or 'any other,' when preceded by a specific enumeration, are commonly given a restricted meaning, and limited to articles of the same nature as those previously described. The rule of ejusdem generis has been declared to be a specific application of the broader maxim of 'noscitur a sociis' which is discussed in other sections of this subdivision."

But the rule of ejusdem generis is not without qualification and restriction. The restrictions upon the application of the rule are set forth in sec. 250, on pp. 246–248:

"§ 250—Restrictions Upon Operation of Rule of Ejusdem Generis.—The rule of ejusdem generis is far from being one of universal application. It is neither final nor conclusive; there are many cases to which claims of the applicability of the doctrine are denied, and in which general terms in a statute are given meanings beyond the specific terms preceding them. In any event, the rule of ejusdem generis does not necessarily require that the general term be limited in its scope to the identical things specifically enumerated.

"The doctrine of ejusdem generis is but a rule of construction to aid in ascertaining and giving effect to the legislative intent, where there is uncertainty, and does not warrant the court in subverting or defeating the legislative will by confining the operation of a statute within narrower limits than intended by the lawmakers. If, on consideration of the context and whole law upon the subject, and the purposes sought to be effected, it is apparent that the legislature intended the general words to go beyond the class specially designated, the rule does not apply.

"The rule of ejusdem generis does not apply to restrict the operation of a general expression where the specific things enumerated have no common characteristic, and differ greatly from one another. Moreover, where the particular words embrace all the persons or objects of the class mentioned, and thereby exhaust the class or genus, there can be nothing ejusdem generis left for the rule to operate on, and a meaning must be given to the general words different from that indicated by the specific words, or there can be ascribed to them no meaning at all."

It is possible the legislature, notwithstanding the indications of the context as to the proper characterization of the word "excavation" could·have intended the word to have the broad, literal meaning portrayed in the engineering or scientific definition thereof. But to give it such meaning, words such as "or along side" would have

to be read into the phrase "around such works or shafts," and other important rules of construction disregarded.

In order to aid in reaching the proper construction of the statute, we will now refer to a number of such other rules, which are well known to the legal profession and the courts.

■ As to the proper construction of the word "excavation" (which in the dictionaries, as we have stated, is given two meanings, an ordinary or popular meaning, and a technical one, and concerning which the popular meaning seems to be indicated by the context), we find sec. 187, pp. 319–322 of Crawford on Statutory Construction to be helpful. It is there stated: "§ 187. Words Having a Technical or Special Meaning—Technical terms in a statute, as we have suggested above, must be accorded their technical meaning, unless the statute indicates that the legislature intended otherwise. Moreover, there is a presumption that they have been used in their technical sense. Nevertheless, where it appears that a contrary meaning was intended by the legislature, the common, or non-technical meaning, should be applied, or the technical meaning enlarged or restricted so as to effectuate the obvious purpose of the legislature. This rule is applicable to technical legal terms, words having a special sense at common law, military terms, and words of arts. And terms borrowed from a foreign law should be given the meaning they have in the foreign law. Similarly, where the words incorporated in a statute have acquired a specific meaning by virtue of judicial interpretation, such meaning should be accepted, in the absence of some indication of a contrary legislative intention. And the same is true with reference to commercial or trade names used in a tariff act to designate certain kinds of goods, where such names have acquired a well-known meaning in trade and commerce. But where a word has both a technical and a popular meaning—no matter in what sort of a statute it appears

—the latter meaning will prevail over the former, in the absence of any indication that the word was used in its technical sense."

In this connection see also 50 Am.Jur., sec. 238, pp. 227–232, and the many cases cited in footnote 17 on pp. 228, 229, among which are: Wren v. Dixon, 40 Nev. 170, 161 P. 722, 167 P. 324, Ann.Cas.1918D, 1064. See also 50 Am.Jur., sec. 277, pp. 263–265.

What effect should be given the phrase "around such works or shafts," as used in the statute, in determining the meaning of the word "excavation?"

■ In this connection we refer to Crawford on Statutory Construction, sec. 165, pp. 258–261, which is as follows:

"§ 165. Statutes as a Whole—Inasmuch as the language of a statute constitutes the depository or reservoir of the legislative intent, in order to ascertain or discover that intent, the statute must be considered as a whole, just as it is necessary to consider a sentence in its entirety in order to grasp its true meaning. Consequently, effect and meaning must be given to every part of the statute which is being subjected to the process of construction—to every section, sentence, clause, phrase and word. This is a principle based upon human experience with man's modes of expression and the inevitable limitations of our language. So far as statutes are concerned, ordinarily, many words and phrases and often sentences must be used to express the legislative idea or intent. Abstractly, a word or phrase might easily convey a meaning quite different from the one actually intended and evident when the word or phrase is considered with those with which it is associated. The same is equally true with sentences and paragraphs. Abstractly, the thought expressed in a detached sentence or paragraph may have little or no resemblance to the idea actually intended. Each word, phrase, clause and sentence are the elements from which the legislative intent is formed. The various words, phrases, clauses, and sentences make up the framework

which supports the legislative intent. They are mutually dependent. Co-operatively they convey the ultimate idea.

"Moreover, a statute should be construed as a whole because it is not to be presumed that the legislature has used any useless words, and because it is a dangerous practice to base the construction upon only a part of it, since one portion may be qualified by other portions. In addition to being subject to qualification, words are not always used accurately by the legislature. The thought conveyed by the statute in its entirety may reveal the inaccurate use.

"Hence, the court should, when it seeks the legislative intent, construe all of the constituents parts of the statute together, and seek to ascertain the legislative intention from the whole act, considering every provision thereof in the light of the general purpose and object of the act itself, and endeavoring to make every part effective, harmonious, and sensible. This means, of course, that the court should attempt to avoid absurd consequences in any part of the statute and refuse to regard any word, phrase, clause, or sentence superfluous, unless such a result is clearly inavoidable. The court must construe the statute in this manner, for by failing to do so, the statute is not considered in its entirety and the intention of the legislature is likely to be defeated. The legislative intent is just as apt to be lost where a word, phrase or sentence of the statute is rejected as where they are considered separate and apart from the rest of the statute. This is in accord with our use of words. The omission of a word from a sentence may easily cause it to express an idea quite different from the one actually intended and expressed." See also 50 Am.Jur., sec. 358, pp. 361–364, which is very similar in substance to the above-mentioned sec. 165 of Crawford.

Undoubtedly, if the word "excavation" be construed to include "ditch," either the word "around" in the phrase "around such works or shafts" would have to be disregarded, or action, so unnecessary as to border on

the absurd or the ridiculous, taken, and the ditch fenced "around" or encircled. Ditches, except in rare instances, have no "ends." To fence around a portion of a ditch, as is contended for in the instant case by respondents, would, as pointed out by Mr. Merrill, amicus curiæ, accomplish no good purpose and prove a real detriment in interfering with cleaning the ditch. To do so would be an economic waste resorted to, not because of any legitimate, natural, economic, civic, or social purpose, but solely in the endeavor to make reconcilable and applicable to ditches a phrase which obviously was never intended to apply to them, because ditches cannot, to any advantage, be encircled. The obvious application of the phrase "around such works or shafts," in view of the context, and the meaning of the words "works" and "shafts," was that it related to shafts, holes and similar excavations of the pit type—the kind of excavations which is meant by the ordinary or popular definition in the dictionaries, as distinguished from the technical or scientific definition. It is necessary to fence "around" such excavations to prevent the danger of falling into them, and the area of such openings on the surface being comparatively small, they may be fenced without great expense. The legislature evidently intended that when there were "works" contiguous to such holes, shafts, or other similar excavations, as often there are in connection with mining shafts and holes, the fence could be either around the "works" adjacent to and including the shaft, hole or other similar excavation, or merely around the excavation proper. The use of the word "or" between the words "works" and "shafts" indicates that alternative. To attempt to extend the application of the said phrase to excavations such as ditches, would be to give it a wholly unreasonable, uneconomic, and artificial application, as above indicated, solely for the purpose of bolstering a construction of the meaning of the word "excavations" according to the scientific or engineering meaning, which, in view of the context, would be likewise artificial, incongruous and inconsistent with the

limitation indicated by said phrase "around such works or shafts." And to fail to regard and properly apply said phrase would be clearly repugnant to the elementary principles of statutory construction expressed so clearly in the above-quoted sections of Crawford on Statutory Construction and of American Jurisprudence to the effect that all words, phrases and sentences must be given their proper effect. These principles have been found by the text-writers and the courts essential to the correct and intelligent interpretation of the true legislative intention.

4. As to conflicting provisions, the principle or rule of construction favored by the text-writers and most courts is stated as part of sec. 166 of Crawford on Statutory Construction, pp. 262, 263, as follows: "* * * Consequently, that construction which will leave every word operative will be favored over one which leaves some word or provision meaningless because of inconsistency. * * *" Many cases are cited in footnote 85 to the text, among which are: Hannon v. Southern Pac. R. Co., 12 Cal.App. 350, 107 P. 335; Postal Tel. Cable Co. v. Norfolk & W. R. Co., 88 Va. 920, 14 S.E. 803. There are only three Nevada cases of which we know, or which have been called to our attention by counsel, which have dealt with this statute of 1866. Two of these were in this court, and one in United States district court. The earliest of these cases was Wiggins v. Henderson, Justice of the Peace, 22 Nev. 103, 36 P. 459, decided in 1894.

Mr. Heward, in "Defendants' Answering Memorandum" has cited that case, and stated: "In fact, H. F. Bartine, attorney for petitioner, admitted that a valid judgment could be rendered under the statute if residence, the existence of an open and dangerous excavation and ownership of the excavation were proved." In that case certiorari was denied upon the ground that the procedure required by the statute had not been complied with. No question was raised in the case as to the meaning of the word "excavation" in the statute,

nor as to whether or not it applied to irrigation ditches. The excavation involved in that case was a well, which was clearly of the same kind or class as shafts, holes or other excavations of the pit type, whose principal danger, as a class, is because of their depth or their location, or both, and the danger of persons and animals falling into them and being injured because of the fall. We might say at this point that we do not agree with the contention, on behalf of petitioners, that the term "or otherwise," or the term "or for any other purpose," as employed in the statute, can properly be applied to curtail their obvious meaning therein by the rule of ejusdem generis. In regard to the phrase "or for any other purpose," we do not agree that the word "other" necessarily means that the excavation must, because of such rule, be for a purpose similar to mining or to obtain water.

The obvious objective of the act, as stated in the same section 1, was to require the erection of "fences, or other safeguards * * *" around such works or shafts, sufficient to securely guard against danger to persons and animals from falling into such excavations. The danger from falling into an excavation of the pit type would be just as great, under similar circumstances as to depth, surrounding formation and other characteristics, whether the excavation was a shaft, or a prospect hole, to obtain ore from the earth or develop same therein, or to obtain water from a well, or whether same did not involve obtaining anything from the earth or developing any substance therein, but was for the entirely different purpose of obtaining access to the basement of a warehouse, as was involved in the case of Anderson v. Feutsch, 31 Nev. 501, 103 P. 1013, 105 P. 99. An excavation to receive the foundation for a building would be for a purpose and use altogether different from mining or to obtain water, the terms immediately preceding the phrase "or for any other purpose" in said section 1, but if such excavation could be fenced for not to exceed $300, the limit of the jurisdiction of justices

of the peace under the Nevada constitution, and same, because of its depth or location, was dangerous to persons and animals who might suffer injury from falling into it, such excavation would be within the meaning of that word, according to both its ordinary meaning and its technical meaning. It was so held in Anderson v. Feutsch, supra, the second of the Nevada cases which have dealt with said statute of 1866. In that case the excavation was, as above indicated, for a purpose wholly different from mining or to obtain water, and we agree fully with the following statement, 31 Nev. on page 510, 105 P. 99, 100, in the decision upon rehearing, by NORCROSS, C. J.: "The trial court held, and we think correctly so, that the appellants were bound, under the provisions of this statute, to keep the excavation in question protected. The earnestness and apparent sincerity with which counsel for appellant contended that the provisions of this act only apply to excavations for mining purposes may have entitled them to a more extended consideration of the point than that given in our former opinion. We have never been impressed, however, that the contention possessed any considerable force. We think it clear, both from the title and body of the act, that it was the intention of the Legislature to protect persons and animals from all excavations, regardless of the purpose for which they were dug. Mining excavations were mentioned particularly, we think, only because they comprise the great majority of all excavations in this state. The great purpose of the act was to protect persons and animals from injury resulting from falling into unprotected excavations. The same injury would result from falling into a certain particular excavation regardless of the purpose for which it was made. For the purpose designed to be accomplished by this act, all excavations are in a common class, and the fact that the Legislature saw fit to specifically designate those made for mining purposes and to comprehend all others in general terms does not, we think, limit the provisions of the law to mining excavations only."

While Mr. Chief Justice NORCROSS used the term "all excavations, regardless of the purpose for which they were dug" and the expression "for the purpose designed to be accomplished by this act, all excavations are in a common class," he was dealing with the contention of the defendant in that case that the purposes intended by the act were mining purposes only, and he held, as we hold herein, that the word "excavation" or "excavations" is not thus limited, and that the purpose of the excavation is immaterial. It is the character or type of the excavation itself, and not its purpose, which is controlling. Judge NORCROSS was dealing with an excavation of a pit type which had been dug in, or alongside the sidewalk on Miner Avenue in Goldfield, and was particularly dangerous because of its location in or near the pathway of pedestrians. There is nothing whatever in the opinion to show that by the use of the word "all" the court intended more than to point out that the word "excavations" was not confined in its meaning to excavations for mining purposes, but was applicable to such excavations as that involved in the Anderson case. The learned justice, by use of the word "all" went a little further, if the expression be taken literally, than required to decide the point then in issue, but any such expression is without significance, as the question of whether excavations such as ditches, which are not particularly hazardous, except for danger of drowning, were within the purview of the act of 1866, was not before him, nor was the choice of definitions of the word "excavation" involved.

The hole or excavation involved in that case was clearly one of the cavity or pit type, within the ordinary meaning of the word "excavations," as distinguished from the technical definition, namely, "an uncovered cutting in the earth," and there is nothing in the use of the word "all" by Justice NORCROSS indicating that he had any excavations in mind, other than those of that type.

The case certainly is not authority to show that

"ditches" were within the purview of the term "excavations" as employed in the said act. The case of Perry v. Tonopah Mining Co., D.C., 13 F.2d 865, in which the opinion was written by Judge Farrington, dealt with the said statute of 1866, as a statutory basis of liability for negligence. A child had fallen into a stope in Tonopah near a pathway leading from Florence Avenue, and which was much frequented by children. The open stope was what miners call a "glory hole." The ore and rock had been mined out "to the surface, leaving a large opening, about 140 feet deep, which defendant had wrongfully and negligently suffered 'to be and remain unfenced, and without any safeguards whatever to guard against danger to persons, and particularly children, from falling into the same,' and without giving 'any warning or notice whatever to persons, and particularly children.' "

Judge Farrington said further in his opinion: "The danger from open cuts on premises *similar to those described in the complaint* is obvious. It was the likelihood of *just such conditions* which prompted the Legislature of the state in 1866 to adopt what is now section 3233 of the Revised Laws of Nevada, and what was then entitled 'An act to secure persons and animals from danger arising from mining and other excavations.' " The statute referred to is the act of 1866, involved in the instant case. The excavation involved in the Perry case was, as above stated, a mining stope, dangerous because of its depth and location, and, as the court indicated, because it was attractive to children. Such an excavation was one of the pit or cavity type, clearly within the provisions of the act, according to the ordinary meaning of the word "excavation," and is in no sense authority to show that the act has any application to "ditches." The court did not attempt to enforce the penal provisions of the act, but did recognize the act as a basis of liability, together with the common law, for negligence, and under the attractive nuisance doctrine,

applicable to children. No question as to the constitutionality of the act was raised. Neither was any question presented or passed upon as to whether its provisions were sufficiently certain and intelligible as to render it enforceable. The case is of no assistance whatever in the determination of any of the questions before us in the instant case. (Emphasis mine.)

Isn't it strange, indeed, that if this act, in existence 81 years, had been intended by the legislature of 1866 to apply to irrigation ditches, that there has been no case before the higher courts, either state or federal, in Nevada involving such application? And the fact that so few cases involving the act in any respect have reached the higher courts has indicated that its enforcement, even as to the hole, pit, or cavity type of excavation to which it unquestionably applies, has been very limited indeed. This has no legal significance, but is interesting, and is mentioned merely in an historical sense.

■ To construe the word "excavation" to include irrigation ditches would clearly compel the conclusion that the act is unconstitutional as violative of article VI, sections 6 and 8, N.C.L., vol. I, 1929, secs. 114, 116, of the Nevada constitution, because to fence or otherwise safeguard an irrigation ditch, such as the Orr ditch, would obviously require an expenditure of many thousands of dollars, and jurisdiction under the 1866 act is conferred upon police judges and justices of the peace, and jurisdiction of the latter, under said constitutional provisions, is limited as to a money demand to an amount not to exceed $300, exclusive of interest. The act does not provide for, or contemplate, fencing or otherwise safeguarding *part* of any shaft, hole, or excavation to which it applies.

The words applicable to that point, as stated in section 1 of the act of 1866, are: "Any person or persons, company or corporation, who shall hereafter dig, sink, or excavate * * * *any shaft, excavation, or hole* * * * shall * * * erect, or cause to be erected * * * fences,

or other safeguards * * * around such *works* or *shafts*." (Emphasis mine.)

And section 2 of the act reads: "Any person being a resident of the county, and knowing, or having reason to believe, that the provisions of section one of this act are being or have been violated within such county, may file a notice with any justice of the peace or police judge therein, which notice shall be in writing, and shall state: First—The location, as near as may be, of the *hole, excavation, or shaft*. Second—That the same is dangerous to persons or animals, and has been left, or is being worked, contrary to the provisions of this act." (Emphasis mine.)

The attempt which was made in the instant proceeding to save the act from the unconstitutionality which is inevitable if same were applied to ditches, would merely lead to unconstitutionality of another kind. To attempt to apply the act to only a *part* of a particular excavation, when the statute provides no standard based on the degree of danger or need, assumed from the extent of population, or other reasonable basis of *general* application, for selection of the part to be fenced, and has no provision even indicating any unit other than its location in the county as the unit of enforcement, would be to open the door to the conversion of the act into special legislation. Not only the ditch (if act were applied to ditches) which should be proceeded against, but the *portion* of that ditch against which enforcement was sought, would be selected by the party initiating the proceeding and filing the notice. (Emphasis mine.) Thus it would depend on the judgment, and not infrequently, we fear, upon the whim or caprice of such individual resident of the county, and, perhaps, in a measure, of the police judge or justice of the peace, as to what ditches, or parts of ditches, should be required to be fenced. This would inevitably lead to discriminatory enforcement of the act, without any sound reason why it should apply to certain portions of ditches and not to other portions equally dangerous.

Unless all the ditches, or at least those of a certain well-defined class within the state, are required to be fenced in their entirety, or at least a reasonable standard of determination, such as that based upon population, is included in the act, and required to be applied generally and uniformly throughout the state as to all cities, counties or towns of a certain class (based on population), the opportunity is afforded for partiality, discrimination, and injustice in the enforcement of the act. Such application of the act as would thus inevitably lead to discrimination and lack of uniformity of enforcement, both in single counties and in the various counties of the state, as compared to each other, would be violative of section 21 of article IV of the constitution of Nevada, which provides: "Section 21. In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the state."

Obviously, a general law could be made applicable, and its operation made uniform throughout the state, in relation to the fencing of ditches (if ditches were intended to be included within the term "excavations" as used in the act) by simply conferring jurisdiction upon the district courts, instead of upon police judges and justices of the peace.

Such acts in other states where they have been enacted quite generally, we believe, follow the pattern of the Colorado act of 1887 (referred to and construed in the case of Platte & Denver Canal & Milling Co. v. Dowell et ux., 17 Colo. 376, 30 P. 68) which, by its title, is disclosed to be applicable to "canals and ditches situated within cities of the first class, or cities existing by special charter, of a population equal to or exceeding said cities of the first class." Session Laws of Colorado 1887, p. 65.

In that act, as above appears, there is a general application to cities of the first class, or cities existing by

special charter of a population equal to such cities of the first class.

This is a sound and salutary limitation, being based upon population which, in the matter of danger from ditches or canals, is a reasonable basis for determining that the need for fencing exists, and it doesn't go to the unreasonable extreme of requiring fencing throughout the state, regardless of the degree of need or of existing danger from the ditches or canals. It requires fencing of all ditches within the cities of the class specified, and therefore does not open the door to discriminatory enforcement depending upon the personal judgment, will, whim, or caprice of an individual resident or of a judicial officer, and it confers jurisdiction upon *"any court of competent jurisdiction."* (Emphasis mine.)

To sanction such procedure as has been resorted to in the instant case, even if enforcement could be impartial, effective and constitutional (which we do not believe), would inevitably result in such a multiplicity of suits as to be intolerable.

In the case of the Orr ditch, the following uncontradicted statement appears on page 33 of the "Memorandum in Support of Petitioner's Application:" "To fence the Orr Ditch, if the law requires fencing of ditches, would cost thousands of dollars. Here the party who filed the notice under sec. 5631, N.C.L., specifies only 75 feet out of 8850 feet of ditch which he alleges is in the City of Reno. Thus he, or any one, would have the right, under the statute, to bring 118 similar actions in the justice court, to compel the fencing of said 8850 feet by merely alleging that the cost of fencing such sections would be less than $300.00."

To be fair and impartial, so that without discrimination the law would operate generally, equally and uniformly throughout the state, within the meaning of section 21 of article IV of the Nevada constitution, as well as to comply with the sound, equitable inhibition against a multiplicity of suits, piecemeal enforcement

of the act, such as attempted in the instant case, cannot be tolerated. With no sound reason for any such division of causes of action or procedure, and no apparent reason at all, other than to attempt to make the act applicable to a class of excavations, which it clearly appears, from the intrinsic provision of the act conferring jurisdiction upon justices of the peace and police judges, and from the phrase "around such works or shafts," and from other features of the act, the legislature intended to exclude, cannot be sanctioned. To sanction same, would be to approve a major evasion of the constitutional limitation upon the jurisdiction of justices of the peace contained in said article VI, sections 6 and 8, N.C.L., vol. I, secs. 114, 116, of the Nevada constitution. This we cannot do. What is the reasonable, and in fact, the essential conclusion which follows from the intrinsic provision of the act conferring upon justices of the peace jurisdiction of proceedings under the said Act of 1866? Such reasonable conclusion unmistakably is, that the requirement of fencing or otherwise safeguarding, is limited to excavations of a class or kind such as those expressly enumerated in the statute, and which do not involve an estimated cost of fencing or safeguarding in excess of $300.

This conclusion is also indicated by the rule of construction to the effect that the legislature is presumed to have intended to legislate constitutionally, and that, as between two possible constructions of an ambiguous statute, or an ambiguous word or phrase therein, that construction should be applied which will lead to the constitutionality of the act, in preference to the construction which would lead to its unconstitutionality. 50 Am.Jur., sec. 226, pp. 209, 210. See also 11 Am.Jur., sec. 97, p. 725, where it is stated: "Rules—It is an elementary principle that where the validity of a statute is assailed and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other it would be valid, the court should adopt the construction which would uphold it. * * *" (See

many cases in footnote 10 decided by the United States supreme court.) Applying this rule of construction, it follows, therefore, that irrigation ditches, which are a class of excavations which usually require more than $300 to fence, were not intended, by the legislature, to be within the meaning of the word "excavation" as employed in said act.

We have thus far in this opinion referred, for the most part, to rules of construction applicable to intrinsic provisions of the act such as the rule of ejusdem generis, the rule that the whole of an act must be given effect, and the appliction of the rule as to constitutionality that arises from the fact that jurisdiction is conferred by the act upon justices of the peace, the jurisdiction of which is limited to $300.

Now it is necessary, before reaching a final determination of this case, to consider certain other well-known rules of statutory construction.

■ A rule of long standing and very general application is that penal statutes must be construed strictly.

■ The said statute of 1866 provides for a civil penalty in case of each violation of the act, and also for a fine as to each such violation. The procedure is civil, but in respect to the fine, the penalty is criminal.

In the instant case, the question of whether or not the statute of 1866 applies to irrigation ditches, and in particular, to the Orr ditch and its owners, is dependent, as we have above indicated, upon the construction or meaning to be given the word "excavation," as employed in the statute, in the absence of any language in the act expressly including "ditches"; and, as the word "excavation" bears two definitions in the standard dictionaries, one of which, the ordinary definition, is usually preferred in the ordinary affairs of life to the other, the technical definition, and the former would not include ditches, it seems clear that the principle requiring a strict construction of penal statutes requires that, in the instant case, the ordinary definition should be followed. This would mean that the word "excavation,"

as used in the act, would be construed to exclude ditches. The specific words associated in section 1 of the act with the word "excavation," together with the other intrinsic provisions of the act hereinabove mentioned, indicate that the legislature did not intend that the act, including its penal provisions, should extend to the owners of ditches such as the Orr ditch; and, therefore, it clearly appears that a strict construction, in accordance with said rule as to penal statutes, would be also consistent with the actual intention of the legislature. See Crawford on Statutory Construction, sec. 240, pp. 460–467.

■ Another important rule of statutory construction, very generally applied, is the rule which provides that statutes in derogation of the common law shall be strictly construed, in the absence of any statute changing the rule.

In Crawford on Statutory Construction, sec. 228, pp. 422, 423, it is stated: "§ 228. The Common Law—If a statute is ambiguous or its meaning uncertain, it should be construed in connection with the common law in force when the statute was enacted. This is the rule whether the statute is simply declaratory of the common law, or whether it abrogates, modifies or alters it in any way. And there is a presumption that the law-makers did not intend to abrogate or alter it in any manner, although where the intention to alter or repeal is clearly expressed, it must be given effect by the courts. Even where this intention appears, there is a further presumption that the law-makers did not intend to alter the common law beyond the scope clearly expressed, or fairly implied. In fact, it may be set down, as a general rule, that a statute in derogation of the common law shall be strictly construed, although in some states this rule has been changed by statute. * * *"

We point particularly to the words of limitation, which apply, even where the intention to alter, abrogate, or change the common-law rule or principle is manifest, and which are: "* * * There is a further presumption

that the law makers did not intend to alter the common law *beyond the scope clearly expressed, or fairly implied."* (Emphasis ours.)

How does that provision and limitation affect the situation in the instant case? The common law of Nevada, at the time of the enactment of said statute of 1886, did not require the fencing of shafts, holes, or other excavations, no matter how dangerous to persons or animals from falling into them, unless they were so situated, in relation to traveled roads, highways, or footpaths, as to render them extraordinarily dangerous.

The common law of England required the owner of livestock, for example, to fence his premises in order to keep his cattle or other animals from straying or trespassing upon the property of others. This rule was followed in only a few of the American states, notably in Kansas, Indiana, New York and Tennessee.

In Annotated Cases, 1917A, pp. 288–296, there occurs a well-prepared and exhaustive note upon the subject "Liability as for Negligence of Owner of Uninclosed Land for Injury to Domestic Animal Straying Thereon." In that note, on page 291, it is stated:

"In most of the American states, the rule of the English common law requiring the owner of domestic animals to keep them on his own premises was considered to be inapplicable to a sparsely settled and uncultivated country and was not adopted as part of the common law. Therefore, in those jurisdictions, the owner of animals is not guilty of negligence, or of a violation of duty, in allowing them to run at large on the open, uninclosed lands of another. * * *" (Citing cases from Arkansas, Illinois, Iowa, Kentucky, Missouri, Ohio, Pennsylvania, Idaho and the reported case from Wyoming, Gillespie v. Wheatland Industrial Co., 22 Wyo. 331, 140 P. 832, 52 L.R.A., N.S., 133 Ann.Cas.1917A, 287, to which the said note is appended.) Further on, in the note, it is stated, as to the liability of the owner of straying livestock for trespass:

"It follows from this change of the common-law rule that cattle or other animals straying on the uninclosed lands of a person other than their owner are not wrongfully on those lands. The right to be on such lands is not, however, a positive right, capable of enforcement, but a mere negative right, protecting the owner from liability for trespass. * * *"

A majority, even of those jurisdictions in which the common-law rule has been changed, refused to recognize any duty on the part of the owner of uninclosed land to protect straying animals from the mere dangerous condition of the premises, such as pitfalls, bogs, wells, etc., or poisons or other dangerous substances allowed to be or remain on the land.

To the same effect is the treatment of the subject in 11 R.C.L., pp. 873, 874. See also note to Gillespie v. Wheatland Industrial Co., supra, 22 Wyo. 331, 140 P. 832, in 52 L.R.A.,N.S., pages 133–140, Ann.Cas. 1917A, 287.

In an extensive annotation in 33 A.L.R., pages 448–464, to the case of St. Louis-San Francisco R. Co. v. Fletcher, 159 Ark. 344, 253 S.W. 12, the subject is exhaustively treated. Under sub-heading III, "Injuries by falling into wells or other excavations," 159 Ark. 344, 253 S.W. 12, 33 A.L.R. on page 455, it is stated: "It seems that ordinarily, in the absence of statutes requiring wells or other excavations to be inclosed or otherwise protected, a land owner is not liable for injuries to trespassing animals which are injured by reason of such excavations on his unfenced or insufficiently fenced premises." In support of this statement of the text, cases are cited from Georgia, Idaho, Illinois, Kansas, Kentucky, Massachusetts, Missouri, North Carolina, Pennsylvania, Texas, Wyoming, and England.

The same rule of nonliability to fence to keep out *actual* trespassers (in the few states where the original common law prevails requiring fencing to keep animals

from straying from the owner's premises) and permissive trespassers (in the many American states where the original common-law rule no longer prevails) is applied as to ponds, and watercourses or conduits privately owned, such as canals and irrigation ditches.

There is little difference between the application of the rule, in general, as to trespassing children and trespassing animals, except under the doctrine of attractive nuisance. For business or economic reasons the rule, as we have stated, in most of the states was relaxed so as to permit animals to trespass without the owner incurring liability for damages. This does not apply to children. They become *actual* trespassers when they go upon the land of their neighbors without permission, and the owner of the land, or the watercourse, upon which they trespass, is not liable for injury to them under ordinarily dangerous conditions and circumstances. Only under exceptional circumstances, such as the maintenance of a dangerous excavation upon or adjacent to a traveled street or pathway, or the maintenance upon the premises of some object, such as a mechanical device especially attractive to children, does he become liable. And the mere presence of a body of water, such as a pond, or creek, or a conduit such as a canal or ditch, is held by the great majority of the authorities not to be an attractive nuisance.

Petitioner, and Mr. Merrill, amicus curiæ, in support of petitioner's application, have cited numerous cases to that effect, among which is the Kansas case of Somerfield et al. v. Land & Power Co., 93 Kan. 762, 145 P. 893, in which it is stated:

"An open, unfenced, and unguarded canal about 50 feet wide with perpendicular banks about 13 feet high, carrying a stream of water about 7 feet deep through a populous city, maintained for commercial purposes, and along the banks of which the public passes and children gather to play and fish and swim, and into which

a young child of the plaintiffs fell and was drowned, cannot, of itself, be regarded as an attractive nuisance which will render the company owning and operating it liable for the death of the child under the doctrine of the turntable cases. * * *

"There is no greater necessity to build a fence or put a cover over a canal than there would be to fence or cover a natural stream, * * *

"The court does not feel warranted in extending the doctrine so as to make appellant liable for failing to fence or guard a watercourse like the one in question * * *."

Other cases cited to the same effect are: Smith et ux. v. United Power & Light Corporation, 142 Kan. 723, 51 P.2d 976; Mindeman v. Sanitary District of Chicago, 317 Ill. 529, 148 N.E. 304; Emond et al. v. Kimberly-Clark Company, 159 Wis. 83, 149 N.W. 760; Peters v. Bowman, 115 Cal. 345, 47 P. 113, on rehearing Id., page 598, 56 Am.St.Rep. 106; McCabe v. American Woolen Co., C.C.Mass., 124 F. 283; Sullivan v. Huidekoper, 27 App.D.C. 154, 7 Ann. Cas. 196, 5 L.R.A.,N.S., 263; Indianapolis Water Co. v. Harold, 170 Ind. 170, 83 N.E. 993; Thompson v. Illinois Central Railway Co., 105 Miss. 636, 63 So. 185, 47 L.R.A.,N.S., 1101; Salladay v. Old Dominion Copper Mining Co., 12 Ariz. 124, 100 P. 441.

It appearing beyond any doubt whatever that, under the common law, in the absence of statute, and unless exceptionally dangerous conditions exist, there is no duty upon the owners of irrigation ditches, canals, ponds and other artificial bodies of water to fence them, the question remaining is, as above indicated, did the legislature, by the statute of 1866, intend to depart from the common law to the extent of requiring them to be fenced, or otherwise safeguarded?

We cannot conclude that the legislature did so intend, unless, as stated by Mr. Crawford and before quoted, the intention to do so is "clearly expressed or fairly implied." The legislature expressed an intention to

depart from the common law by the provision in section 1 of said statute of 1866 requiring the erection or causing to be erected by persons digging, sinking or excavating "any shaft, excavation, or hole * * * [of] good and substantial fences, or other safeguards * * * around such works or shafts * * *," as above stated. None of this sort of excavations, in absence of statute, was required to be fenced at common law. But by the use of the word "excavation" was it the intention of the legislature to so far depart from the common law as to intend to include irrigation ditches within the scope of the meaning of "excavation," regardless of the other express provisions of the statute pointing unmistakably in the opposite direction? The departure from the original common law in most of the United States, and particularly in the far western states, due to the thinly settled range lands of large expanse and the necessity of financial frugality in a pioneer country, had been in the direction of lessening the requirement of fencing.

By dispensing with the common-law rule requiring fencing to keep cattle at home, their action was primarily to avoid the expense of fencing. Each of such settlers was willing to stand the loss and annoyance of having his neighbor's cattle graze upon his lands, such privilege being reciprocal; and each was willing to suffer the occasional loss that would necessarily result from his cattle being injured from the ordinarily dangerous conditions on his neighbor's land, in order to get established in a new country with the least expense possible.

It cannot be said that by the use of the word "excavation" in view of the words with which it was by the legislature associated in the statute of 1866, and of the context—particularly the phrase "around such works or shafts"—and bearing in mind the fact that such construction would lead to the certain unconstitutionality of the act, that the legislature *expressed* the intention to include irrigation ditches. Only the scientific, or technical, definition of the word, as has been shown,

would be the basis for such construction, and all the above-mentioned factors indicate that the ordinary definition of the word "excavation" was intended, and that no departure from the common law, so drastic, radical and extreme as to require fencing all the irrigation ditches in the state was within the intent or contemplation of the legislature.

But can the requirement of fencing irrigation ditches be deemed fairly implied, within the meaning of "excavation" or "excavations," as used in the statute, by reason of any condition, exceptionally dangerous to persons and animals occasioned by such ditches? In view of the conditions and circumstances existing *at the time of the passage of the act,* was there any reason within the scope of the police power, which, in the interest of the public safety and general welfare, could be deemed to have caused the legislature to have intended, by implication, so great a departure from the common law as to require, under such then prevailing conditions, the fencing of all irrigation ditches in the state?

There are a few other rules of statutory construction which we believe of assistance in making certain of a correct conclusion as to whether such legislative intent could be deemed implied. We will now refer to certain of such rules and quote portions of them which seem clearly applicable.

In Crawford on Statutory Construction, sec. 210, pp. 366–368, under the heading "Contemporaneous Circumstances," occurs the following treatment of the question as to what extent conditions and circumstances existing at the time of the enactment of the statute should influence its interpretation.

We quote: "§ 210. Contemporaneous Circumstances—When it becomes necessary to resort to extraneous matters in order to ascertain the meaning of a statute, the court may properly refer to what is generally known as contemporaneous circumstances. Such circumstances include the history of the times

existing when the law was enacted, the previous state of the law, the evils intended to be corrected, and even, according to some cases, the habits and activities of the people. Generally, these circumstances may be defined as the conditions under which the statute was enacted. And the court may inform itself as to these circumstances by any and all available means. The various extraneous considerations, however, are not to be resorted to in order to alter the meaning of the statute, but to remove whatever doubt that still remains after all intrinsic aids have been considered."

And under the general subject "Statutes," in 50 Am. Jur., we will quote section 236 on page 224, and a portion of section 237, on the same page:

"§ 236. Meaning of Terms as of Time of Enactment— Because it is easy to be wise after one sees the results of experience there is always a tendency, it has been said, to construe the language of a statute in the light in which it appears when the construction is given. Such an approach to the question is erroneous. Since, in determining the meaning of the terms of a statute, the aim is to discover the connotation which the legislature attached to the words, phrases, and clauses employed, the words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted, and the statute must be construed as it was intended to be understood when it was passed.

"§ 237. Application to New Cases, Conditions, and Subjects—Since the words of a statute must be taken in the sense in which they were understood at the time when the statute was enacted, and the statute must be construed as it was intended to be understood when it was passed, statutes are to be read in the light of attendant conditions at the time of their enactment. A new meaning may not be given the words of an old statute in consequence of changed conditions. The fact that events probably not foreseen by the legislature have occurred, does not permit the court to undertake to

enact new law. Indeed, new things may arise, which are not regarded within the meaning of a statute, although they are within the terms thereof. * * *"

■ That it is proper for courts, in interpreting ambiguous statutes, to consider the effect of possible interpretations, is stated in Crawford on Statutory Construction, sec. 177, pp. 286, 287, in part, as follows:

"§ 177. The Effect of the Statute—Since the basic and underlying purpose of all legislation, at least in theory, is to promote justice, it would seem that the effect of the statute should be of primary concern. If this is so, the effect of a suggested construction is an important consideration and one which the court should never neglect.

"Consequently, where the language of the statute is ambiguous or susceptible to more than one construction, the court should not hesitate to consider the consequences which will follow the adoption of a particular construction, in determining the question whether the asserted construction represents the legislative intent."

■ In endeavoring to determine what the legislature of 1866 actually intended, and not for the purpose of substituting in any sense our judgment of what public policy required at the time the statute in question was enacted, further quotations from Crawford on Statutory Construction seem appropriate. We quote a portion of sec. 175, p. 283, and of sec. 178, pp. 291–294:

"Since all statutes must be interpreted before they can be applied, might not the rule be announced that all statutes are subject to construction, and if there be more than one possible construction, that meaning will be adopted which most reasonably seems to be the one intended by the legislature, after the court has considered all intrinsic and extrinsic aids? Since in practice this largely represents the method actually pursued by the courts in its search for the legislative intent, there should be no real objection to recognizing that which already is a reality.

"And what is it that most reasonably represents the

legislative intent, where a statute is susceptible to two or more interpretations? Everything being equal in other respects, that interpretation should surely be accepted by the courts as constituting the one intended by the law-makers, which operates most equitably, justly and reasonably as determined by our existing standards of proper conduct and by our conceptions of what is right and what is wrong, of what is just and what is unjust. As we have stated time after time in this treatise, where a statute operates inequitably or absurdly or with some other universally recognized undesirable effect, even though it may on its face seem unambiguous, nevertheless is it not highly proper to suspect that it does not represent the will of the legislature? In the first place, our law-makers must be presumed to legislate for the equal benefit of all persons as judged in the light of our standards of proper human conduct and relationship. In the second place, at best, the legislature can only lay down general rules to cover classes of cases. The application of the law to specific controversies must be left largely to the courts, with a discretion to include or exclude the specific controversy in litigation from the operation of the statute."

"§ 178. The Spirit and Reason of the Law—Closely related to the rule which permits the court to consider the effect of the statute, is the rule which allows consideration of the spirit and reason of the law. The effect of a suggested construction indicates, as we shall see later, whether it is in accord with the actual intent of the legislature. Actually, there seems to be but little distinction between the spirit and reason of the law and the law's purpose, or scope. While the purpose of a statute is the reason for its enactment, the spirit or reason of the law is, perhaps strictly speaking, more closely connected to the legislative intention.

"Since the intention of the legislature constitutes the law of its enactments, it is the intention rather than the literal meaning of the statute which controls; or, as is generally said, the spirit of the statute will prevail

over the strict letter. Consequently, cases which do not come within the strict letter of the statute, if within the spirit, will fall within the scope of the statute, and cases within the letter of the statute, if without its spirit, will not come within its operation. But this principle is not applicable if the statute is clear and unambiguous, so that there is no doubt concerning the legislative intent. Numerous factors may, however, raise such a doubt. It may be raised where a literal meaning leads to absurdity, contradiction, or any other effect which is contrary to the legitimate objects of legislation. As a result, the court may consider the spirit and reason of a statute where a literal meaning would lead to absurdity, contradiction, injustice, or would defeat the clear purpose of the law-makers. It may also be used where the statute is inaccurate in the use of words or phrases, or contains provisions inserted unintentionally."

In the light of these rules which enlightened legal minds have evolved to aid in the construction of ambiguous words and phrases in statutes, so that justice may be advanced, how should the word "excavation" be interpreted?

We will consider how the historical background and the conditions, circumstances and environment of the people of the state at the time the statute of 1866 was enacted.

In 1866, the state was sparsely settled. Only a few villages, towns or communities existed in the state. · For the most part, the ranches had been established on or near streams of water, and were in isolated locations, usually comparatively long distances from each other. Irrigation ditches to convey water from its natural streams to the various ranches were necessarily established. Cities, such as Reno, were in their infancy. The Orr ditch was established in or about the year 1872, as stated on pages 1 and 2 of the application for writ of prohibition in the instant case. The said ditch, at

the time it was constructed, "extended through unin-habited territory north of the present City of Reno on the foothills; that since said construction the City of Reno has extended its improvements and a portion of said ditch lies within the corporate limits of the City of Reno."

The larger settlements in the State, in 1866, when the statute in question was enacted, were the mining towns or cities, some of which suddenly increased in population due to mining discoveries and consequent interest and excitement. Shafts, holes, and other excava-tions, for mining purposes, to obtain water, and for building purposes were dug by the dozens, and in some places, by the hundreds, in and near such camps. Fre-quently, because of favorable mining developments, some of them were dug near streets, roads, and trails traveled by pedestrians, and many such excavations dotted the hillsides upon which cattle roamed. Viewed in the light of conditions existing at that time (and it is as of *that time* that we must determine what the legislature may reasonably be deemed to have intended by the said statute of 1866), there was vital need for a statute to require the fencing or covering of excavations such as shafts, pits, and holes in the earth, which were usually dangerous because of their depth or location, or both.

In some of those active mining camps, such exca-vations increased so prolifically and in locations so unexpected, that the pedestrians, including many newcomers, were in many instances unfamiliar with their locations.

No such conditions existed as to the persons engaged in ranching and served by irrigation ditches. The ditches were comparatively few in number, and were located in permanent locations well-known to the few ranchmen and their families residing near them. Those settlers were pioneers in a new country. They had little difficulty in training their children to avoid such of the ditches as conveyed sufficient water to be dangerous,

and in view of the conditions then existing, there was no real need for the fencing of irrigation ditches. These pioneer settlers usually were persons who had to economize in every way possible in order to establish their homes and launch their livestock and farming enterprises. To compel the fencing of all the irrigation ditches in the state, involving as to many of the individual ditches an expenditure of thousands of dollars, would be a stupendous undertaking, even under present conditions. In 1866 it would have been a death blow to many of the ranching and agricultural undertakings in the state. Like most of the American, and all of the far western states, Nevada had established a public policy of departure from the common law to the extent of abrogating the requirement of fencing to keep cattle on the home premises.

In Colorado the legislature in 1887 (21 years after our statute of 1866 was enacted), in formulating their statute, requiring the fencing of a canal in Denver, which had become a populous city (Platte & Denver Canal & Milling Co. v. Dowell et ux., supra), were careful to limit the application of the statute to cities of the first class, or cities which existed by special charter of a population equal to or exceeding cities of the first class.

In view of the conditions existing in Nevada in February 1866 (less than two years after becoming a state) is it to be believed, in the light of reason and common sense, that the legislature of that year intended, by the statute in question, to require the fencing, or otherwise safeguarding, of all the irrigation ditches in the State?

Such a construction would, in our judgment, be imputing to that legislature, the members of which we must assume were fairly representative of their constituencies, the intent to cripple, if not destroy, one of the state's two paramount industries, when to do so, in the absence of any substantial need for such far-reaching legislation, would have been unreasonable and unjust to the point of absurdity.

To require shafts, holes, and similar excavations to

be fenced, as the legislature obviously intended, led to no such result, as the need was substantial for fencing of that kind of excavations, and the cost was small.

In view of the many indications from the facts, surrounding background and circumstances, and from the language of the statute itself, interpreted with the aid of the many sound rules of statutory construction we have employed, and above all, from the standpoint of reason, common sense and the accomplishment of justice, our path is not obscure.

■ For the reasons indicated, we shall apply the rule of ejusdem generis in construing the meaning and application of the words "excavation" and "excavations," as employed in said statute of 1866. Accordingly, we hold that said word "excavation," as used in the statute, means, and is hereby construed to mean, an opening or cavity in the earth of a kind or type similar to a shaft or a hole, with which words the said word "excavation" is associated in the statute. By this construction we adopt· for the purposes of the instant case, the ordinary or popular definition of the word "excavation," as distinguished from its scientific or technical definition.

We are not unconcerned as to the tragic deaths of little children which have occurred over a period of years, from falling into the irrigation ditches in the cities of Reno and Sparks, and keenly regret that there are no legal instrumentalities available to us to enable us to assist toward an effective remedy. We commend most heartily the worthy efforts of Mr. Heward, Mr. Zahniser and others to attract popular attention to the great need of effective action to fence or otherwise safeguard the irrigation ditches in Reno and Sparks, where reasonably necessary in the interest of public safety, and especially the safety of those children too young adequately to protect themselves. We may say further, we have noted with approval and hope the earnest studies being made by the committee in Reno, and by many public spirited citizens of Reno and Sparks, and the loyal support being given by the press, in the

endeavor to find a solution, and we wish them Godspeed in their worthy efforts, and sincerely trust a wise and practicable plan may be formulated and speedily executed. The present activities indicate that the people of those cities now fully realize the very serious, and, we believe, the primary or paramount responsibility resting upon them in this regard. The foregoing, holding that the statute of 1866 is inapplicable to the Orr ditch, renders unnecessary the determination of the several constitutional questions which have been presented by the petitioner. And the same may be said as to the question raised as to whether the terms of the statute are so vague, ambiguous and uncertain, as to procedure, as to render the statute invalid, although we have been much impressed with the brief of Mr. Forman, amicus curiæ, as to that phase of the case. These questions, in view of our foregoing holding, having thus become merely academic and hypothetical, we should not determine them in the instant case. In that connection we cite 11 Am.Jur., sec. 93, p. 720, dealing with the subject, "Avoidance of Unnecessary Decisions."

It has been urged by petitioner and conceded by respondents that prohibition is the appropriate procedure and remedy in the instant case.

It is ordered, therefore, that respondent's demurrer to the petition herein be, and the same is hereby, overruled, and that the alternative writ of prohibition heretofore issued be, and the same is hereby, made permanent.

EATHER, C. J., concurs.

TABER, J., participated in hearing the arguments in this case, but died before the completion of the opinion.